**Charles W. DOUGLAS, Appellant,**

v.

**UNITED STATES of America,**
**Appellee (two cases).**

**Nos. 12795, 12879.**

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 20, 1956.

Decided Nov. 9, 1956.

Petition for Rehearing In Banc Denied Dec. 4, 1956.

---

54

Mr. Edward Bennett Williams, Washington, D. C. (appointed by this Court), with whom Miss Agnes A. Neill, Washington, D. C., was on the brief, for appellant.

Mr. Harold H. Greene, Asst. U. S. Atty., with whom Messrs. Leo A. Rover, U. S. Atty., at the time record was filed, Lewis A. Carroll and Harold H. Titus, Jr., Asst. U. S. Attys., were on the brief, for appellee.

Before EDGERTON, Chief Judge, and FAHY and WASHINGTON, Circuit Judges.

FAHY, Circuit Judge.

These appeals question two separate convictions of robbery at two separate trials.[1] Both robberies occurred in the early morning of September 11, 1952. The accused, Douglas, pleaded not guilty in each case and petitioned for a lunacy inquiry under § 24–301, D.C.Code 1951. Such an inquiry was held and on December 19, 1952, he was adjudged to be of unsound mind. On January 16, 1953, he was transferred to St. Elizabeths Hospital. He was discharged from treatment there July 20, 1954, when the Superintendent of the Hospital certified to the District Court that Douglas had "recovered his reason" and was of sound mind.

On September 10, 1954, he was judicially determined "mentally competent and able to understand the proceedings against him and properly to assist in his own defense." He was tried for one of the robberies, case No. 12795, in November, 1954, and for the other, case No. 12879, in May, 1955.

In No. 12795 the robbery occurred at the Ebbitt Hotel in Washington. The night manager testified that about 3:30 a. m. the accused entered the hotel and requested a room. He was informed the hotel was filled and appeared to leave; but he returned with a bellboy in front of him and said, "Let me have the money or I'll kill this guy." The manager placed about $91.00 on the counter. Appellant scooped up the money, put it in his pocket and left. The night manager testified that appellant had a gun in the bellboy's back.

In No. 12879, the robbery occurred at the Court Hotel on Sixth Street, Northwest. Douglas appeared there also at about 3 a. m. asking for a room. During the discussion with the night manager, as the latter testified, Douglas walked around the desk, stuck a revolver into the witness' side and demanded all his money, threatening to kill him. The witness handed over his wallet, asking its return on sentimental grounds. Douglas took the money, approximately $9.00, and left the wallet on the desk. He then ordered the witness into the adjoining parlor, felt for a lock, found none, and pulled the door shut. He left in a few minutes, saying if the witness called the police he would come back and kill him.

The events unquestionably occurred substantially as above outlined. The contention on appeal is principally that evidence of the diseased mental condition of the accused requires us to hold that the trial judges should have directed verdicts of acquittal on the ground of insanity. See § 24–301, D.C.Code 1951, since amended by Pub.L. No. 313, 84th Cong. 1st Sess., August 9, 1955.

The United States first suggests that such a direction would have been unconstitutional because if it had been given then the trial court would have been required to confine accused to St. Elizabeths Hospital pursuant to section 24–301 of the Code, which would have deprived him of an opportunity to obtain an outright acquittal at the hands of the jury.

1. The crimes charged are defined in § 22–2901, D.C.Code 1951.

But Douglas was not deprived of the opportunity to be acquitted outright because the cases went to the juries without the direction, and we accordingly need not decide the suggested constitutional question.[2]

■■■ There was evidence in both trials that the accused was of unsound mind when the robberies occurred. The prosecution therefore was under the necessity of establishing to the satisfaction of the jury beyond a reasonable doubt that the robberies were not the result of Douglas' insanity. Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L. Ed. 499. There, in the course of an exhaustive review, the Supreme Court held:

"Strictly speaking, the burden of proof * * * is on the prosecution from the beginning to the end of the trial, and applies to every element necessary to constitute the crime. Giving to the prosecution, where the defense is insanity, the benefit in the way of proof of the presumption in favor of sanity, the vital question, from the time a plea of not guilty is entered until the return of the verdict, is whether, upon all the evidence, by whatever side adduced, guilt is established beyond reasonable doubt. If the whole evidence, including that supplied by the presumption of sanity, does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offense charged." Id., 160 U.S. at pages 487–488, 16 S.Ct. at page 358.

And see Tatum v. United States, 88 U.S. App.D.C. 386, 190 F.2d 612. Restating the matter within the rule prevailing in this jurisdiction since Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430, in order to justify a conviction the proof, considered with the presumption of sanity, must exclude beyond a reasonable doubt the hypothesis that the conduct indicted was the product of a diseased mind.[3]

We outline the evidence relevant to this question. In No. 12795 two of the psychiatrists who testified, Drs. Perretti and Gilbert, had examined the accused in December, 1952, at the request of Chief Judge Laws. This was about three months after the robbery. Dr. Perretti concluded that Douglas was of unsound mind, suffering from a psychosis, symptoms of which he described. He said that although it could not definitely be established how long the mental illness would take to reach the state he found he believed it went back as far as September.

Dr. Gilbert testified he examined the accused on December 6 and 13, 1952, and was of opinion he was of unsound mind suffering from dementia praecox, based on symptoms he described and on information Douglas supplied about his past life. In his opinion the accused had been suffering from a mental disorder or a mental disease at least for several years.

On cross-examination Dr. Gilbert was asked whether the disease or disorder he found in December caused the crime, and answered, "It contributed largely to it, I would say, by reason of the serious nature of the disease." Dr. Perretti was not asked to express an opinion on causation of the robbery.

Douglas' sister testified he had attempted suicide on three or possibly four

2. If such a question exists in other circumstances the trial court may avoid it by allowing the jury to arrive at a verdict, as was here done, and then, if the verdict is one of guilty, entering a judgment of not guilty by reason of insanity notwithstanding the verdict should the court conclude that this were required. It is also probable in most instances that the constitutional difficulty could be avoided by an instruction that unless the jury acquit outright, as they may, they should return a verdict of not guilty on the ground of insanity. Cf. note 7, infra.

3. We use at times "diseased mind" without adding "mental defect" because the evidence makes only "diseased mind" applicable to this case, within the definitions of terms set forth in Durham v. United States, supra.

occasions, suffered from severe headaches during which he pulled his hair and struck his head against the wall, had threatened her with physical violence for no apparent reason, and that she had become so concerned about his condition that she had called another brother home from his service base and had written a letter to the Veterans Administration requesting mental treatment for accused a few months before the crime, but no such treatment was received.[4] Appellant's brother corroborated the sister's testimony along these lines. A roomer in her apartment in 1951 testified that Douglas suffered severe headaches during which he would moan and say, "By ——, they are killing me."

The prosecution called Dr. Epstein, one of the phychiatrists responsible for the treatment of the accused at St. Elizabeths Hospital where he remained from January 16, 1953,[5] until July 1954. The official hospital diagnosis, with which the doctor agreed, was that he was afflicted with schizophrenia reaction, paranoid type. He said that he might have seen Douglas weekly; at times the interviews might last thirty minutes, at times an hour, and at times much less. He said that as far as possible seeing the patient's family is among the practices of the physicians at the hospital, and that another physician at the hospital saw the mother of Douglas and made a notation of what the mother related. Asked whether Douglas was suffering from mental disease or disorder which would have caused the commission of a crime on or about September 11, 1952, he said he could say rather definitely that he was likely a disturbed person in the sense that there was information from his mother he had attempted to take his life, but as to the presence and severity of the illness, or the characteristics it showed at the time, "that is something I could not do"; that with certain illnesses "we can be extremely definite. We can say it was lifelong. We can say

it occurred following a certain accident and give a rather definite date. In this particular illness we are unable to do this. * * * So when asked how long Mr. Douglas was sick before the time I saw him [about 4 months after September 11, 1952] in a disease which has a very variable picture" he would be quite unable to say.

The Government relies on the testimony of the night manager and bellboy at the Ebbitt Hotel where the robbery in No. 12795 occurred, and testimony of the arresting officers. This covered the conduct of Douglas in connection with and after the robbery, including statements made soon after. The Government argues that this testimony disclosed to the jury normal conduct.

In No. 12879, the expert opinion evidence consisted only of the testimony of Dr. Gilbert, who said as before that he had examined Douglas at the jail December 6 and December 13, 1952, as a result of which he arrived at the opinion that he was of unsound mind, suffering from the most common type of mental disorder—dementia praecox. The symptoms of hallucinations he found were based upon what Douglas himself told the witness. The doctor went into some detail. He said he believed the diseased condition had existed for a considerable period of time, for "several months" or "at least a few years"; that if Douglas had committed the unlawful act in September, "from the symptoms present I would think there was a very definite causal relation."

Douglas' sister gave substantially the same testimony in this case as in No. 12795. She also said that on some days Douglas acted perfectly normal and on others he did not and that in her opinion he was suffering from a mental disease during April and May, 1952, the period to which most of her testimony related.

Other testimony in No. 12879 was that of the night manager of the Court Hotel,

---

**4.** The Government stipulated that such a letter had been written.

**5.** As hereinabove recited Douglas, on December 19, 1952, was adjudged to be of unsound mind.

the victim of the robbery. He explained how it was carried out. He noticed nothing abnormal except the robbery at gun point. There was no indication of insanity, though he thought Douglas had been drinking a little without actually being intoxicated.

The police officers who arrested Douglas and who took his statement gave testimony in No. 12879 substantially like that given by them in No. 12795. Douglas' statement was admitted in evidence. The officers said he talked normally, was fully aware of what he was doing, and gave no indication of any delusions.

Each case was submitted to a jury without a request by Douglas' counsel for a directed verdict on the ground of insanity. In both cases the District Court charged the juries on the issue of insanity, and in both cases the juries refused to find Douglas not guilty by reason of insanity. Among the instructions, closely alike in each case, was one that when some evidence of mental disease or defect is introduced then the sanity of the accused, like all other facts, must be proved as part of the prosecution's case to the satisfaction of the jury beyond a reasonable doubt, since the burden of proof is upon the prosecution and this burden applies to every element necessary to constitute the crime charged; that unless the jury believed beyond a reasonable doubt either that he was not suffering from a diseased or defective mental condition or that the act was not the product of such abnormality they must find the accused not guilty by reason of insanity; but that he would be responsible for his unlawful act if there was no causal connection between such mental abnormality and the wrongful act.[6]

In an appropriate case there is a duty to set aside a verdict of guilty and to direct a verdict of not guilty by reason of insanity—a duty to be performed with caution, however, because of the deference due to the jury in resolving factual issues.[7] While "the issue of the criminal responsibility of a defendant suffering from mental disease is not an issue of fact in the same sense as the commission of the offense", Holloway v. United States, 80 U.S.App.D.C. 3, 4, 148 F.2d 665, 666, still it is an issue of fact. Both Holloway and Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430, discuss in some detail the nature of this issue and the criteria the jury is to use in resolving it. In Durham we defined the issue itself to be whether or not the indicted conduct is "the product of mental disease or mental defect", "whether the accused acted because of a mental disorder". Id., 94 U.S.App.D.C. at pages 241, 242, 214 F. 2d at pages 875, 876.[8]

As to the criteria, or tests, to be used in resolving this issue Durham gives greater latitude than theretofore had prevailed in this jurisdiction. We had said in Holloway, following the M'Naghten rule, 8 Eng.Rep. 718, that "The ordinary test of criminal responsibility is whether defendant could tell right from wrong", but we had there added, "A slightly broader test is whether his reason had ceased to have dominion of his mind to such an extent that his

6. The court in No. 12795 also explained that it is provided by statute that if the jury should return a verdict of not guilty solely on the ground of insanity, the court may certify the facts to the proper federal authority, that the defendant under such circumstances would be confined to a hospital or other suitable institution for the care and treatment of insane persons, and that the law provided for the discharge of such person so committed to a hospital or other institution for the care of insane persons upon restoration to sanity. In No. 12879, the court advised the jury that should there be a verdict of not guilty by reason of insanity the accused would be presumed to be insane and may be confined in a hospital for the insane as long as the public safety and his welfare required.

7. We need not now decide whether this should be done if the accused objects. Cf. note 2, supra, and connected text.

8. It is to be kept in mind there need be only a reasonable doubt about it to entitle the accused to an acquittal. See Davis v. United States, supra.

will was controlled, not by rational thought, but by mental disease." 80 U.S. App.D.C. at page 4, 148 F.2d at page 666. In the earlier case of Smith v. United States, 59 App.D.C. 144, 36 F.2d 548, 70 A.L.R. 654, we had also added the "irresistible impulse" test which permitted the jury to consider whether the accused suffered from such a "diseased mental condition as to deprive him of the will power to resist the insane impulse * * *." Id., 59 App.D.C. at page 145, 36 F.2d at page 549. But in Durham we concluded that the advance of psychiatric knowledge demonstrated the fallacy of making these particular " 'symptoms, phases or manifestations' " [9] the exclusive criteria to guide the jury. In so holding, however, we did not purport to bar all use of the older tests: testimony given in their terms may still be received if the expert witness feels able to give it, and where a proper evidential foundation is laid a trial court should permit the jury to consider such criteria in resolving the ultimate issue "whether the accused acted because of a mental disorder". In aid of such a determination the court may permit the jury to consider [10] whether or not the accused understood the nature of what he was doing and whether or not his actions were due to a failure, because of mental disease or defect, properly to control his conduct.

Appellant urges that the evidence affords no legal support for a finding beyond a reasonable doubt that mental disease did not cause the indicted conduct, and that therefore we should hold that the District Court erred in not directing verdicts of not guilty by reason of insanity. His position gains support from the undeniable fact that treatment rather than imprisonment for crime was appropriate for Douglas in December, 1952, within three months of the robberies. He was then formally adjudged to be of unsound mind. And in No. 12795 Dr. Epstein, the Government's witness, confirmed that when Douglas reached the hospital in January, 1953, he was suffering from a serious mental disease. Douglas remained at the hospital for about eighteen months. Two doctors in No. 12795, and one in No. 12879, who found him insane in December, 1952, testified that such a condition had prevailed the previous September when the robberies occurred. Dr. Gilbert testified in both trials that the condition contributed largely to the robberies. Dr. Perretti was not asked about this. The Government introduced no expert evidence of sanity in September or during the succeeding twenty months. Two of the doctors who testified had been appointed by Chief Judge Laws to examine Douglas. The third was a member of the staff of St. Elizabeths Hospital and had examined him in that capacity. The disinterested, expert testimony in each trial casts a deep shadow over the mental capacity of Douglas in September 1952. As the Supreme Court said in Davis v. United States, supra [160 U.S. 469, 16 S.Ct. 358], "the vital question * * * is whether, upon all the evidence, by whatever side adduced, guilt is established beyond reasonable doubt", which means, as

9. We use here the language of Durham and, indeed, of other cases; yet " 'symptoms, phases or manifestations' " is hardly apt to describe the criteria which Durham and the other decisions establish to guide the jury. These expressions are applicable more properly to experiences and actions of an accused which evidence his condition rather than to the ultimate question the jury is to decide in determining guilt. See Wechsler, "The Criteria of Criminal Responsibility," 22 U.Chi.L.Rev. 367, 373.

10. The charge to the jury outlined by this court in Durham, supra, 94 U.S.App.D.C.

at page 241, 214 F.2d at page 875, was not intended to be a model for all cases. We explicitly stated: "We do not, and indeed could not, formulate an instruction which would be either appropriate or binding in all cases." It is essential to a charge under the Durham decision that there be a proper statement of the ultimate issue in an insanity defense. But the evidence submitted in each case may differ and consequently the particular tests available to aid in deciding the ultimate issue would not always be the same.

there also said exclusion "beyond reasonable doubt [of] the hypothesis of insanity * * *," or as Durham now would express it, exclusion beyond reasonable doubt of the hypothesis that the conduct was caused by a diseased mind. We find it impossible to hold in the face of the generally uniform testimony of the three disinterested psychiatrists, the only ones who testified, that this test essential to the validity of the verdicts was met. On any rational view of this evidence, emanating from Government sources, reasonable doubt existed as to Douglas' sanity on September 12, 1952. There was no medical evidence whatever to exclude the hypothesis of insanity. The prosecution could seek only to discredit the testimony of doctors who had been appointed by the Court in December, 1952, on the basis of whose opinion Douglas had been adjudged then to be insane. Consistent with and indeed fortifying this testimony was that of Dr. Epstein based on Douglas' condition in January, 1953.

True, there was non-expert testimony. But this, as will be seen from its outline earlier in this opinion, cut both ways, at least as deeply in the direction of insanity as of sanity. Our judicial conclusion that as a factual matter a reasonable doubt was created by the disinterested medical testimony, coupled with the adjudication of unsoundness of mind and the hospitalization for eighteen months, is not changed by the lay witnesses who testified only as to Douglas' conduct during the robberies and shortly thereafter.

 Holloway is not a barrier to our conclusion. It is there said that the judgment of the psychiatrist, while relevant is not necessarily controlling, and that after the matter has been submitted to the jury and they have declared that there is no reasonable doubt of the defendant's sanity, "their judgment should not be disturbed on the ground it is contrary to expert psychiatric opinion." 80 U.S.App.D.C. at page 5, 148 F.2d at page 667. We agree, but this is not authority for disregarding expert testimony. It must be considered with the other evidence, not arbitrarily rejected. A jury may not be upheld in arbitrarily convicting of crime.[11] We as the reviewing court must be able to say that the result is rationally consistent with the evidence, measured by the required degree of proof. When we said in Holloway that we can reverse the jury only if its verdict "shocks the conscience of the court", 80 U.S.App.D.C. at page 5, 148 F.2d at page 667, this was but a graphic expression for this type of case, involving a subtle issue of a person's mental condition in relation to criminal responsibility, of the rule generally applicable when a court is asked to set aside a jury verdict for lack of sufficient evidence to support it. See, e. g., Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, and Cooper v. United States, 94 U.S.App.D.C. 343, 218 F.2d 39. Each case must be decided upon its own facts. No uniform legal principle is available to lead to a like appraisal of different factual situations. In the present cases we are simply unable to say that the juries were warranted on the evidence in failing to entertain a reasonable doubt that except for a diseased mental condition Douglas would have committed the robberies, that is, we are unable to say that the juries were warranted in reaching an abiding conviction that the abnormal mental condition definitely ascertained as early as December was not a cause without which the September robberies would not have occurred. Being of this opinion, after according due deference to the verdicts of the juries and to the denials by the trial court of new trials, we are constrained to conclude that it would be inconsistent with applicable legal standards to hold on the records as presently constituted that punishment for criminal conduct, rather than treatment for a mental disease, was the remedy. As was said in

---

11. Indeed, an arbitrary acquittal can stand only because the Constitution protects against double jeopardy.

Holloway, "Our collective conscience does not allow punishment where it cannot impose blame." 80 U.S.App.D.C. at pages 4–5, 148 F.2d at pages 666–667. See also, note 6 supra.[12]

 It does not follow that we should now direct that Douglas be acquitted by reason of insanity. Dr. Epstein did not testify in No. 12879, no doubt because his testimony was deemed privileged under Taylor v. United States, 95 U.S.App.D.C. 373, 222 F.2d 398. By reason of the amendment of § 14–308, D.C.Code 1951 his testimony would now be available. Furthermore, there are ambiguities in the testimony which a retrial might resolve. And the dearth of the prosecution's non-medical testimony, dating on the present records only from the time of the robberies, might be overcome. We cannot say as to these matters. But they justify the exercise of our discretion to permit new trials. In Bryan v. United States, 338 U.S. 552, 559, 70 S.Ct. 317, 94 L.Ed. 335, a new trial was authorized although the evidence on the first trial of that case, as here, was held not to support a conviction. An additional reason for this disposition of the appeals is that it does not appear that the trials were conducted with awareness that Durham does not bar testimony, if available, in terms of the older tests of insanity to which we have referred, and, furthermore, does not bar instructions by the court permitting jury consideration of such tests having support in the evidence, provided that the Durham decision is followed in its definition of the ultimate jury question to be decided.

The only other question which need be mentioned concerns the admission of testimony of Dr. Epstein in No. 12795 which appellant claims was privileged. See Taylor v. United States, supra. Since § 14–308, D.C.Code 1951 has been amended

so as to permit such testimony where insanity is relied upon as a defense, the question will not recur in event of new trials.

Reversed and remanded for further proceedings not inconsistent with this opinion.

---

12. The remedy of treatment results in the accused returning to the life of the community only after disinterested experts think he may safely do so; whereas the person imprisoned enters again into the community when his sentence is served though he may not be ready for a law-abiding life. For these reasons, as well as because the criminal law does not punish in the absence of blame, we should guard against imprisonment where a reasonable doubt exists as to sanity in its relation to the crime charged.