Thomas E. BRISCOE, Petitioner,

v.

UNITED STATES of America, Respondent.

Misc. No. 855.

United States Court of Appeals District of Columbia Circuit.

Sept. 20, 1957.

Wilbur K. Miller, J., dissented in part.

BAZELON, Circuit Judge.

This case is before us, as a regularly designated division of the court hearing motions, on a petition for leave to appeal in forma pauperis from a conviction for arson (entered on a plea of guilty) and on the written opposition thereto filed by the Government. The statement of the case which follows is drawn from the allegations of the petition which the Government admits, either specifically or by failure to controvert, as supplemented by the original papers in the District Court's file of the case.

Petitioner, found at the scene of a fire in a vacant house when fire and police officials responded to an alarm, was indicted for arson. An attorney appointed for him by the District Court, being assured by petitioner that he had had nothing to do with the fire, entered a plea of not guilty.

On the day set for trial, counsel learned from the arresting officers that

his client had admitted setting the fire and had given the officers a written confession on the basis of which it was their opinion that he "was sick and needed psychiatric treatment." The account petitioner gave the officers revealed the classic symptoms of the pyromaniac who sets fires to gratify sexual urges. See Cleckley, The Mask of Sanity 288 (3d ed. 1955); Guttmacher and Weihofen, Psychiatry and the Law 57 (1952). He told them he had been starting fires since he was twelve years old; that he had started about one hundred fires; that he had set about fifteen fires in the same block of vacant houses in the past year; and that the fire at which he had been apprehended was the second he had lit in that very house that night. The pattern of his abnormalcy, as revealed in his confession, is as follows: He awakes in the night feeling a strong sexual urge. He goes out and starts a fire and then turns in an alarm. He watches the firemen put out the fire and only then obtains sexual gratification, sometimes with his wife and sometimes by masturbation. On the night in question, feeling unsatisfied after acting out his pattern, he returned to the scene and acted it out again.

These facts, learned on April 11, 1956, the day set for trial, obviously required an altogether different preparation for defense. The petition before us alleges and the Government does not deny that defense counsel laid his predicament before the assignment judge;[1] that the judge said that counsel's statement alone was insufficient ground for ordering a psychiatric examination of the accused; that the judge advised counsel that if he entered a plea of guilty, there would be ample opportunity, in the interval before sentencing, to investigate the possibility of an insanity defense and, if successful, to withdraw the guilty plea; and that counsel thereupon withdrew the not guilty plea and entered a plea of guilty. The case was then referred to the Probation Office for investigation and sentencing was set for June 1, 1956. To pursue the investigation of the insanity defense, counsel arranged with the probation officer for a psychiatric examination. Shortly before the sentencing date, however, counsel learned from the probation officer that it had been decided not to have petitioner examined.[2]

On June 1, 1956, counsel orally moved before the sentencing judge, under Rule 32(d), Fed.Rules Crim.Proc., 18 U.S. C.A., to withdraw the guilty plea and enter a plea of not guilty. The Government admits that the motion was denied solely on the ground that it was not in writing and that immediately thereafter the judge pronounced sentence. Imposition of sentence automatically imposed upon petitioner the heavy burden of showing "manifest injustice" as a basis for post-sentence withdrawal of the guilty plea. Rule 37(d), F.R.Crim.P. On June 12, 1956, counsel filed a written motion to vacate the judgment and withdraw the plea. In connection with this motion, the judge ordered a psychiatric examination to be made by Dr. Thomas E. Griffin, Chief, Legal Psychiatric Services, to determine whether petitioner had been mentally competent when the guilty plea was entered and when the sentence was imposed. Dr. Griffin, on the basis of an examination of petitioner conducted in his cell on June 26, 1956,

---

1. The Government states, in its opposition, that counsel informed the assignment judge that "counsel had recently read petitioner's confession, talked with several prospective witnesses of the Government and concluded that petitioner was of unsound mind."

2. Counsel stated in his memorandum in support of his June 12, 1956, motion in the court below that the reason given by the probation officer for deciding not to have petitioner examined was that, in the officer's opinion, petitioner was "mentally defective, but not psychotic." The assumption that psychosis is a legally sufficient mental disease and that other illnesses are not is erroneous. Whether the probation officer based it on psychiatric advice does not appear. See text 101 U.S.App.D.C. ——, 248 F.2d 643, 644 infra.

reported that he was then and had been on the dates in question "of sound mind." The judge thereupon ruled that the petitioner had failed to make such a showing of "insanity as would constitute a legal defense," a showing which the court thought necessary to establish "manifest injustice." The court denied the motion without prejudice to renewal "upon further showing of sufficient facts as would constitute a legal defense of insanity" and then ordered Dr. Griffin "to make a further mental examination of the defendant in accordance with this order." After another jail interview, Dr. Griffin reported that petitioner had probably been "of sound mind" when the crime was committed.

On September 26, 1956, counsel again moved to vacate the judgment and withdraw the guilty plea. Before ruling on this motion, the District Court, on December 4, 1956, ordered an examination by Dr. William G. Cushard of St. Elizabeths Hospital for the purpose of ascertaining petitioner's mental condition at the time of the crime and the guilty plea. Dr. Cushard, after a jail interview with petitioner, reported that, in his opinion, petitioner was not suffering from a mental disease when he saw him and that there was nothing to indicate mental disease at the time of the crime or the guilty plea, but that petitioner was "suffering from a severe degree of mental defect." He reported also that petitioner had been admitted to the District Training School some fifteen years before as a mentally retarded person with an I. Q. of 46, subsequently determined to be 41, and that he had been a rather serious behavior problem at the school, absconding 26 times and threatening to burn the buildings or employees' automobiles. Dr. Cushard recommended that a clinical psychologist examine petitioner to "recheck the degree of mental defect." On January 4, 1957, the court appointed Dr. John L. Endacott to make the psychological examination. Dr. Endacott examined petitioner on January 26, 1957, and reported to Dr. Cushard that he found the subject to be a "borderline mental defective," rather than "strictly a mental defective." Dr. Cushard thereupon reported to the court on February 18, 1957, that he felt required to accept Dr. Endacott's findings and that, on those findings, petitioner "is not suffering from mental defect of a sufficient severity to render him mentally incompetent." He added: "In view of the rather confusing and unusual psychological findings concerning the intelligence level of this man I shall be glad to discuss the case with you, if you wish." The record does not show whether such a discussion occurred. In any event, having held petitioner's motion under advisement until July 5, 1957, the court, on that date, denied it.

An application for leave to proceed in forma pauperis was denied by the District Court on July 11, 1957, as "frivolous, without merit and * * * not taken in good faith," in that "careful consideration [had been] given by qualified psychiatrists to any suggestion of insanity on the part of the defendant, and * * * all such psychiatrists agreed there was no evidence of such insanity."

From the admitted facts on the record before us, the conclusion is inescapable that justice required that petitioner be permitted to plead not guilty. It was, therefore, error to have denied the June 1, 1956, pre-sentence motion to withdraw the guilty plea.[3] The ground upon which that motion was denied was that it was not in writing. But, since the motion was made at the sentencing hearing and since the requirement of writing does not apply to a motion "made during a trial or hearing," Rule 47, F.R.Crim.P., counsel had a right to make

3. In this view of the case, it is unnecessary to reach the question whether the post-sentence motions of June 12 and September 26, 1956, were properly denied. Nor is it necessary to reach the question whether it was proper to have declined to commit petitioner to a mental hospital as provided in D.C.Code, § 24–301 when the petitioner's most revealing confession was first disclosed to the court.

his motion orally. Even if the requirement of writing were applicable, the court had discretion under Rule 47 to entertain and grant an oral motion. And, even if it were a proper exercise of discretion to have denied this oral motion, e. g., on a theory that the motion should be in writing in order to apprise the prosecution of its exact terms and give it an opportunity to file a reply, the court should have deferred sentencing petitioner long enough to permit preparation of a written motion. Granting leave to file a written motion gives the accused less than he is entitled to, unless sentencing is deferred, because, on a post-sentence motion, the accused has the heavy burden of showing that not to allow a change of plea would be "manifest injustice." Rule 37(d), F.R.Crim.P.; cf. Bergen v. United States, 8 Cir., 1944, 145 F.2d 181, 187. The imposition upon petitioner of this heavy burden, simply because his motion was oral, cannot be justified.

As the judge construed the "manifest injustice" burden, it required the petitioner to establish a defense of insanity.[4] Under a plea of not guilty, defending on the ground of insanity, petitioner would be required only to introduce "some evidence" of insanity, after which the Government would have the burden of proving beyond a reasonable doubt that the act of arson was not the product of a mental disease or defect. Davis v. United States, 1895, 160 U.S. 469, 488, 16 S. Ct. 353, 40 L.Ed. 499; Tatum v. United States, 1951, 88 U.S.App.D.C. 386, 190 F.2d 612; Douglas v. United States, 1956, 99 U.S.App.D.C. 232, 239 F.2d 52. If the Government were to offer the bare conclusions of Drs. Griffin and Cushard that petitioner is or was "of sound mind" or not suffering from "mental disease"

or from "mental defect of a sufficient severity to render him mentally incompetent," [5] cross-examination could reveal the factual content of these conclusions, leaving it for the jury to determine, on the basis of those facts, as well as the doctors' opinions, the confession and any other evidence brought to bear, whether it had been shown beyond a reasonable doubt that the act was not the product of mental disease or defect. The effect of denying petitioner's pre-sentence motion on the ground that it was not in writing and then sentencing him before his counsel could put it in writing, was to deprive petitioner of the right to bring the issue of his criminal responsibility before a jury, unless he could first prove "manifest injustice," which the sentencing judge took to mean such "insanity as would constitute a legal defense." The burden of proof on the issue of insanity was thus shifted from the prosecution to the defense.

And petitioner was required to bear this burden, not only without the financial resources to employ psychiatrists, but without the opportunity to examine the court-appointed psychiatrists to elucidate the meaning of the conclusory statements upon which the court relied. The reports of the psychiatrists do not reveal the basis for their conclusions and there is no way of knowing whether they used the terms "sound mind" or "mental disease" or "mental defect" in their legal or medical sense. At a trial, however, whether petitioner was suffering from such "mental disease" or "mental defect," when he lit the fire, as to discharge him of criminal responsibility, Durham v. United States, 1954, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430, would be determined by the trier of the facts, not by the psychiatric witnesses.

4. The first post-sentence motion, made on June 12, 1956, was denied on June 29, 1956, on the ground "that defendant has failed to make a sufficient showing of insanity as would constitute a legal defense."

5. Dr. Cushard's statements left open the question whether, though not so defec-

tive as to be incompetent to plead to a charge, petitioner had been so defective as to justify discharging him of criminal responsibility. Competency to stand trial is, of course, not equivalent to legal sanity which imposes criminal responsibility. See Ashley v. Pescor, 8 Cir., 1945, 147 F.2d 318, 320.

The witnesses' role would be to supply to the trier of the facts the data upon which the determination can be made. If, by testimony that the accused either was or was not suffering from a "mental disease" or a "mental defect," a psychiatrist would be expressing a judgment that the accused should or should not be acquitted, that would be a legal rather than medical judgment and would usurp the function of the trier of the facts.[6] While the state of the accused's mental health is a proper subject of medical opinion, no purpose is served by giving the fact trier a doctor's version of a legal opinion. To that end, if the psychiatrists were to testify in terms embodying legal conclusions, the lawyers, by examination and cross-examination, would seek to bring out the medical facts. The same is true if the psychiatrists were to testify in such ambiguities as "sound mind" or "unsound mind."

The statements of the psychiatrists in the instant case that petitioner was free from "mental disease" could have been intended to mean that he was of normal mental health[7]—a medical judgment within the witnesses' competence and useful to the fact trier. They could also have been intended to mean that petitioner's illness, not being a psychosis, was not such a "disease" as discharges of guilt—a legal judgment not within the witnesses' competence and of no use to the fact trier. With the ordinary trial processes unavailable for elucidating the psychiatrists' conclusory statements, the District Court had no way of knowing what meaning was intended.

The court's conclusion that the psychiatrists' statements amounted to no "showing of sufficient facts as would constitute a legal defense of insanity" is meaningful, therefore, only on the unacceptable theory that the burden of proving insanity is upon the accused.

Judge Bastian voted to grant and Judge Miller voted to deny the petition for leave to appeal in forma pauperis. I joined Judge Bastian for the purpose of reaching decision. But I would go further. The facts admitted on the pleadings before us cry out for reversal of the conviction, so that petitioner may enter a plea of not guilty and have a trial[8] of the issue of his criminal responsibility for his confessed act of arson.

Petitioner has already served more than fifteen months of his sentence of two to eight years. Much of that time was consumed by the District Court's conscientious and commendable efforts to provide the petitioner with the means of sustaining the burden of showing "manifest injustice," by ordering one psychiatric examination after another, so long as there appeared to be some area left unexplored. The facts remain, however, that the imposition of the "manifest injustice" burden was error and that the process of determining whether the burden could be sustained continued until July 5, 1957, more than thirteen months after sentencing. To require that petitioner now pursue the normal appellate process may leave justice undone for many months more.[9] Since petitioner

6. The Assistant Superintendent of St. Elizabeths Hospital, at a round table discussion at the University of Chicago, reported that, after we decided Durham v. United States, 1954, 94 U.S.App.D.C. 228, 214 F.2d 862, the hospital staff agreed that sociopathic or psychopathic personality (which may include pyromania, see Durham v. United States, 1956, 99 U.S.App.D.C. 132, 133, 237 F.2d 760, 761, note 6) should not be regarded as "mental disease" within the meaning of the new rule. Weihofen, The Urge To Punish 87 (1956). This inevitably encroaches upon the jury function.

7. If the facts revealed by petitioner's confession were available to the psychiatrists, I assume they did not mean to say he was of normal mental health. If those facts were not available to them, the reliability of their statements is obviously seriously diminished.

8. Unless, in appropriate proceedings before trial, he should be found mentally incompetent to be tried. D.C.Code, § 24–301.

9. The median time between docketing of a criminal appeal in this court and its disposition is 5.6 months. In half of the

may be eligible for release as early as May 31, 1958, it is even possible that the unjust sentence will have been served before decision of the appeal. And, since release from the penitentiary is generally based on passage of time rather than fitness for release, appellant, if he has the pyromania to which he confessed but which was not shown because he was denied a trial, would again imperil the community. While I recognize that short-circuiting the normal appellate process is an extreme measure, it is plainly required to bring to an end the extreme injustice revealed by the Government's admissions.

BASTIAN, Circuit Judge.

This case came before the panel simply on a motion for leave to appeal *in forma pauperis.* There was no motion by defendant to reverse and, of course, no record of the proceedings in the District Court and no opportunity for the United States attorney to argue or to present the reasons for the action of the trial judge insofar as the correctness of the final judgment was concerned. We had before us only the motion for leave to proceed *in forma pauperis* (not verified), affidavit of poverty, and the Government's opposition (also not verified).[1]

■ I felt that the motion for leave to file *in forma pauperis* should be granted as, from the papers, it appeared that the questions involved merited consideration by this Court. Judge Bazelon felt likewise; but Judge Miller, being of contrary opinion, dissented. Thus the only motion before us was granted by a majority vote.

Judge Bazelon, however, felt we should go further and summarily reverse. I disagree for the following, among other, reasons, and I am authorized to say that Judge Miller concurs in my views:

■ First, there was no such motion before us, no complete record, and no opportunity for either side to argue. We had nothing before us but the petition for leave to appeal *in forma pauperis* and the opposition thereto—nothing else. While Judge Bazelon has made an examination of certain of the records in the District Court not formally before us, we have no means of knowing that we have *all* the records necessary to a proper consideration on the merits. It is a long road between granting leave to appeal *in forma pauperis* and a reversal on the merits. While I have not had the opportunity to make a survey of this point, I think such a search would establish the fact that considerably less than a majority of the cases in which leave to file *in forma pauperis* is granted are in fact reversed. It is no argument to say that in certain cases the Supreme Court has granted a petition for writ of certiorari and reversed in the same order. In those cases, almost invariably, the entire record is before the Court, as is the opinion and decision of the Court of Appeals, as well as argument on the merits.

Secondly, the action suggested by Judge Bazelon would institute a practice which would be at variance with that now established of setting our cases by lot. Our present practice is one that is entirely free from criticism. Cases are not selected for argument before any panel by the Chief Judge, the Clerk, or any one else. The judges are drawn for certain days entirely by lot; and cases, on motions as well as on the merits, fall to the judges so drawn in regular order. It would do violence to our practice to permit a panel to which has been assigned a motion to take the case and

cases, therefore, the appellate process consumes more than 5.6 months—occasionally even a year or more.

1. While Judge Bazelon has personally examined certain of the records in the District Court, still these do not constitute

the complete record. The stenographic record is not before us, the United States attorney has not had the opportunity to augment the records examined by Judge Bazelon, and the full and complete facts should be certified to us.

proceed to dispose of it finally.[2] All motions are not as vital as the one before us; and our present practice would suffer if, on a preliminary motion, the merits of a case could be determined.

Thirdly, here even defendant's trial counsel, who is an able practitioner assigned to the case by the District Court, and serving ably and without compensation, did not ask the extraordinary relief suggested by Judge Bazelon; and, as stated, there has been no opportunity to bring up a complete record, to file briefs on the merits, and no opportunity to argue the ultimate result urged.

Finally, certainly a final ruling on the appeal could be quickly accomplished by the shortening of the time to file the record, and briefs, and setting the case for final argument on an adequate record and briefs on the substantive question on appeal. No need exists for the extraordinary action suggested, even if Rules 39(c) and (d) would permit such action.

2. Of course, sometimes the assigned motion may finally dispose of the matter, e. g., motion to dismiss or affirm.