**UNITED STATES of America,**
**Plaintiff,**

v.

**Calvin T. AMBURGEY, Defendant.**

**Crim. A. No. 146–60.**

United States District Court
District of Columbia.

Dec. 1, 1960.

688

Oliver Gasch, U. S. Atty., District of Columbia, Thomas M. O'Malley, Asst. U. S. Atty., Washington, D. C., for plaintiff.

Rolland G. Lamensdorf, Washington, D. C., for defendant.

YOUNGDAHL, District Judge.

This case, which presents several important questions in the administration of the Durham [1] rule and the defense of insanity in District of Columbia criminal prosecutions,[2] is before the Court in the form of an alternative motion by the defendant, Calvin T. Amburgey, for judgment of acquittal by reason of insanity,[3] or for a new trial.[4] At the conclusion of the trial, the Court, which heard the case without a jury, found the defendant guilty of forging and uttering four checks,[5] and rejected the defense of insanity.

Before discussing the legal issues posed by this motion, a brief outline of the facts of the case may be helpful:

The defendant stands convicted of forging the name of G. Howland Shaw to four checks taken from Mr. Shaw's voucher, and of uttering the checks to four separate individuals. The eight offenses took place between November 22 and December 29, 1959; the defendant was arrested and charged with their commission on January 19, 1960.

At his arraignment, defendant indicated that he desired to "plead guilty on the grounds of insanity" because he had "a mental hospitalization background", and further indicated that he lacked

1. Durham v. United States, 1954, 94 U.S. App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430.

2. D.C.Code § 24–301 (1951 ed.; Supp. VIII, 1960).

3. Rule 29, Federal Rules of Criminal Procedure, 18 U.S.C.A.

4. Rule 33, Id.

5. D.C.Code § 22–1401.

funds to hire an attorney. The Court appointed an attorney and a plea of not guilty was entered.

Within two weeks the court-appointed attorney moved the Court for a mental examination (1) to discover whether defendant was competent to stand trial and (2) to attempt to discover defendant's mental state at the time the offenses were committed.[6] On March 14, 1960, Chief Judge Pine granted this motion, and pursuant to his order defendant was admitted to St. Elizabeths Hospital.[7]

At the end of the ninety days of examination called for by the order, Dr. Overholser, the Superintendent of St. Elizabeths, reported to the Court: first, that the defendant was competent to stand trial, and second, that he was

> "suffering from a mental disease, Personality Disorder, at the present time and was suffering from this mental disease on [the dates of the alleged offenses]. However, we are unable to express an opinion as to whether or not the alleged crimes were the product of this mental disease."

No objection having been filed to this finding of competence to stand trial,[8] and defendant having waived his right to a jury, the trial commenced.

That defendant committed the charged crimes was quickly established, for the accounts of the Government's witnesses on this aspect of the case were not seriously challenged by the defendant.[9]

Evidence on the insanity defense, which came first from the complainant, Mr.

Shaw, and second, from two psychiatrists, was much less conclusive.

Mr. Shaw commenced his testimony—which was probably sufficient under the test now recognized to "raise" the insanity defense—by indicating that he had tried to help Amburgey find and hold a job, and that he sometimes had Amburgey stay in his home, the better to supervise this project.

Mr. Shaw related that on November 2, 1959, three weeks before the first forgery charged in the indictment, Amburgey attempted suicide by taking an overdose of sleeping tablets, and that on the day following, he had voluntarily committed himself to the psychiatric division of D. C. General Hospital. This commitment, Mr. Shaw further testified, lasted for two weeks, terminating when Amburgey "left" the hospital late one night. At that time, according to Mr. Shaw, a Dr. McAdoo of the staff of D. C. General was in the process of drawing papers to bring Amburgey before the Mental Health Commission for possible commitment to St. Elizabeths.

Mr. Shaw also testified to hearsay information that Amburgey had been in an automobile accident in 1955, in which he suffered a crushed skull. Mr. Shaw concluded his testimony by stating that he was "quite convinced that [Amburgey] was mentally ill" at the time of the offenses; when pressed for the basis for this opinion, he pointed to Amburgey's inability to hold a job; to difficulty in rousing him in the morning; and to "a whole series of bizzare things" he had

---

6. D.C.Code § 24–301(a).

7. The Court notes, parenthetically, that although the order authorizing the mental examination was entered on March 14, 1960, the defendant was not admitted to St. Elizabeths for this purpose until April 19, the stated reason being unavailability of bed space in the interim. This is not said in criticism of the conscientious staff at St. Elizabeths, but rather to indicate one of the difficulties faced in providing defendants with the speedy trial guaranteed to them by the Constitution.

8. D.C.Code § 24–301(b).

9. The Government's case was proved through Mr. Shaw, who established the defendant's opportunity to secure the checks in question; through the testimony of three of their recipients and of a handwriting expert; and through the account by a police officer of the contents of defendant's voluntary confession. Following this testimony the Government rested, offering no psychiatric witnesses.

supposedly done to a Mrs. Meek who had befriended him—[10]

"An accumulation of a whole series of incidents, each one of which, perhaps, wasn't too important, but the cumulative effect of which led me to reach that conclusion."

Far less satisfactory was the testimony of the two St. Elizabeths' psychiatrists, Drs. Owens and Klinger, who were called on defendant's behalf. In substance they both testified that as of the dates of the alleged crimes, Amburgey was suffering from a sociopathic personality, anti-social type; that this condition was considered by them and by a majority of American psychiatrists to be a mental disease; that they could express no opinion on whether the crimes in question were the "product" of this condition; and that no treatment was available at St. Elizabeths for it. Dr. Owens indicated that his difficulty in expressing an opinion on productivity was partially caused by the fact that Amburgey had left the District of Columbia after committing the acts—possibly to avoid being apprehended—although the doctor did indicate that apprehension is not generally considered to be a principal subconscious desire of sociopaths. Most of all, the psychiatrists had difficulty in attempting to pinpoint the particular way or ways in which the mental condition of this defendant, diagnosed as a sociopathic personality, anti-social type, differs from that of the "ordinary criminal," and thus why this condition should be considered a mental disease.

Following the testimony of these two psychiatrists, the Court heard argument from both sides on whether defendant had produced " 'some evidence' of insanity" as required to "raise" the insanity defense,[11] and thus placed the burden on the Government of proving sanity beyond a reasonable doubt as an element of its affirmative case.[12] The Court concluded —on the basis of its study at that time of the relevant decisions of the Court of Appeals of this Circuit—that the defendant had not successfully interposed the defense. The Court read these decisions to require that in order to put the burden of proving sanity on the Government, a defendant produce (1) "some evidence" of mental illness and (2) "some evidence" that the crime in question was the product of the alleged mental illness.[13] In this case the Court felt the defendant had not produced the requisite particularized evidence of productivity— the latter element of the defense.[13a]

This holding indicated to the Government that it had no responsibility to produce psychiatric witnesses. The Government produced no such witnesses, and the Court held the defendant guilty.

## I

■ Further extensive study of both pre- and post-Durham decisions by the Court of Appeals has convinced the Court that although there is some uncertainty

---

10. No details to support this last statement were called for by either counsel.

11. Smith v. United States, 1959, 106 U.S. App.D.C. 318, 319, 272 F.2d 547, 548.

12. Davis v. United States, 1895, 160 U.S. 469, 485–488, 16 S.Ct. 353, 40 L.Ed. 499.

13. The Court relied chiefly on the following language from Carter v. United States, 1957, 102 U.S.App.D.C. 227, 234, 252 F.2d 608, 615:
"To claim exemption from responsibility for a criminal act *an accused must assert two conditions:* (1) that he suffered from a mental disease or defect and (2) that his alleged criminal act was the product or result of that disease

or defect. When this defense is raised, the response of the Government may be one or the other (or both alternatively) or two propositions: (1) that the accused had no mental disease or defect or (2) that even if the accused had a mental disease or defect the alleged criminal offense was not the product of the infirmity." (Emphasis added.)
See also the language of the Court in Hopkins v. United States, 1959, 107 U.S. App.D.C. 126, 128, 275 F.2d 155, 157, and the dissent there at note three.

13a. As indicated, neither psychiatrist could testify as to productivity; in fact, one conceded that some evidence might support an opposite opinion. Mr. Shaw was not asked for his opinion on this question.

in the decisions as to what constitutes "some evidence" which a defendant must produce in order to place upon the Government the burden of proving sanity, the better rule, to which the Court now adheres, is that a defendant need produce evidence of mental illness only [14] to properly assert the defense; from such evidence there is a presumption of productivity.

The pre-Durham rule and practice is demonstrated by Tatum v. United States.[15]  At the time that case was decided, the defense of insanity, when properly interposed, required proof by the Government that a defendant, when he committed the charged offense, knew the difference between right and wrong, and that his crime was not the result of an "irresistible impulse."  Yet, to raise the defense, a defendant had only to produce *"some evidence relevant to the issue of"* [16] insanity; he was not required to offer specific evidence that he lacked knowledge of the difference between right and wrong or that he acted because of an irresistible impulse.[17]  It was sufficient that he produce a minimal amount of non-particularized "evidence of mental disorder." [18]

It is highly unlikely that the Durham rule—which liberalized the substantive test of insanity applied at the time of Tatum—would have resulted in a stiffening of Tatum's procedural standard for raising the defense; and two post-Durham cases, among others, illustrate that it has not.  In Dukes v. United States,[19] the insanity defense was held properly asserted solely by evidence of mental illness and in spite of testimony by one doctor that he could give no opinion on the productivity issue, and of another doctor that there was no productivity; in Goforth v. United States,[20] the Court of Appeals held that the insanity burden had shifted to the Government in an opinion which nowhere indicated the necessity for testimony directed specifically to productivity.[21]  Finally, in Durham itself, the Court quoted these words of the British Royal Commission on Capital Punishment:

> "Where a person suffering from a mental abnormality commits a crime, there must always be some likelihood that the abnormality has played some part in the causation of the crime * * *." [22]

and thus, by inference at least, supported the proposition that evidence of mental illness alone destroys any presumption of non-productivity.

■ Thus, this Court is consistent with this line of cases in holding that under the Durham substantive test of insanity, the defendant's procedural burden for asserting the defense is still as it was delineated in Tatum:  he need produce only "some evidence of mental disorder." [23]

14. That is, of a mental disease or defect. See text, infra, at notes 31 and 32.

15. 1951, 88 U.S.App.D.C. 386, 190 F.2d 612.

16. Id., 88 U.S.App.D.C. at page 390, 190 F.2d at page 616 (emphasis in original).

17. As the Court said in Durham, supra, note 1, "None of the testimony before the court in Tatum was couched in terms of 'right and wrong'."  94 U.S.App.D.C. at page 235, 214 F.2d at page 868.

18. Id., 88 U.S.App.D.C. at page 389, 190 F.2d at page 615.

19. 1960, 107 U.S.App.D.C. 382, 278 F.2d 262.

20. 1959, 106 U.S.App.D.C. 111, 269 F.2d 778.

21. A very recent and perhaps firmer holding to this effect is Logan v. United States, D.C.Cir., 1960, 284 F.2d 238.

22. Durham v. United States, supra, 94 U.S.App.D.C. at page 241, 214 F.2d at page 875, note 49.

23. What showing will suffice as "some evidence" is, of course, a question of law to be answered on the facts of each individual case.  See, for example, Goforth v. United States, supra, note 20. For illustrations of cases where "some evidence" was not found, see Smith v. United States, supra, note 11, and Wright v. United States, 1954, 94 U.S. App.D.C. 307, 215 F.2d 498; see these cases and Durham v. United States, supra, 94 U.S.App.D.C. at pages 230–

■ Since in this case the defendant Amburgey did meet the now established burden, the Court rules that he is entitled to a new trial, conditioned on the Government's informing the Court by noon on December 6, 1960, that it will, at a second trial, offer evidence to controvert defendant's claim of mental illness and/or productivity. If the Government would not dispute the insanity claim, judgment of not guilty by reason of insanity will be entered.[24, 25]

## II

As previously indicated, the Court found quite unsatisfactory the psychiatric testimony at the first trial which attempted to demonstrate that the defendant should be considered mentally diseased. Since the case is to be re-tried, and since the psychiatric category to which the defendant allegedly belongs (sociopathic personality, anti-social type) is generally recognized as the "great borderland"[26] between defects of mind and defects of character, the Court would like to set out some questions, the answers to which may be helpful in deciding whether the defendant—whatever the medical label used to describe his condition—should be declared legally not responsible for crimes he is found to have committed.

Preliminarily, the Court would like to indicate what it understands to be the respective functions of the expert medical witness and of the trier of facts under the Durham rule.[27]

■ The task of the former is several-fold. First, and probably most important, psychiatric testimony is to be descriptive; it is to spell out the mental history of the accused with as much detail as necessary in order to give a complete picture; and it is to identify, in terms understandable by laymen, the particular characteristics revealed by this his-

235, 214 F.2d at pages 864–869 for discussion of relevant factors.

That "some evidence" was produced in the present case—under the requirement as here outlined—cannot be disputed; two psychiatrists and a lay witness testified that defendant was, in their opinion, suffering from mental illness when he committed the crimes charged.

24. Yates v. United States, 1957, 354 U.S. 298, 327–328, 77 S.Ct. 1064, 1 L.Ed.2d 1356 and Fielding v. United States, 1957, 102 U.S.App.D.C. 167, 170, 251 F.2d 878, 881 recognized the power of a District Court—when faced with a defendant's alternative motion for judgment or for a new trial—to grant the latter relief where an improper court ruling has presumably led the prosecution to produce less evidence than it had available. That such disposition does not violate the constitutional bar against double jeopardy was most recently reaffirmed by the Supreme Court in Forman v. United States, 1960, 361 U.S. 416, 425–426, 80 S.Ct. 481, 4 L.Ed.2d 412. That the Court may condition its grant of a new trial on the Government's request—and render judgment absolute if none is forthcoming—is illustrated by the mandates of the Court of Appeals in Fielding v. United States, supra; Hopkins v. United States, supra, note 13; Douglas v. United States, 1956, 99 U.S.App.D.C. 232, 240, 239 F.2d 52, 60; and Wright v. United States, 1957, 102 U.S.App.D.C. 36, 42, 250 F.2d 4, 10.

25. Judgment of not guilty by reason of insanity would be appropriate because the evidence adduced by the defendant at the first trial was not merely the "some evidence" sufficient to inject the insanity issue into the case, but also "evidence sufficient to create a reasonable doubt," if not rebutted by the Government. See Durham v. United States, supra note 1, 94 U.S.App.D.C. at page 232, 214 F.2d at page 866, note 8.

By here holding that the Government must produce its own evidence and witnesses to carry its burden of proving sanity beyond a reasonable doubt, the Court does not hold, as a matter of law, that the Government may never discharge this burden solely by discrediting a defendant's evidence and witnesses. But for an indication that the Court of Appeals has come quite close to so holding, see its opinions in Fielding, Hopkins, and Douglas, cited supra note 24.

26. A.L.I., Model Penal Code, Tentative Draft No. 4, App. B, p. 170 (Guttmacher, "Principal Difficulties with the Present Criteria of Responsibility and Possible Alternatives").

27. See generally, Carter v. United States, 1957, 102 U.S.App.D.C. 227, 236–237, 252 F.2d 608, 617–618; and Douglas v. United States, supra note 24.

tory which medical men consider indicative of a diseased mind. It is further to relate why psychiatrists consider these characteristics unusual.

The second task of the psychiatric witness is to draw conclusions from the descriptions he has given—to give his opinion as to whether he considers the medical picture he has presented describes a mental illness. Naturally the descriptive and opinion functions overlap. By indicating which characteristics he considers to be evidence of a diseased mind, he is expressing an opinion of sorts; in justifying his eventual opinion, description either of actual symptoms of the accused or of methods of psychiatric diagnosis may be necessary. In any event, the sum total of the medical testimony should be to give the trier of fact a complete medical picture of the man on trial.

However, it is not so easy to define the trier's task. In general terms, it is

"to determine from all the evidence, including the expert testimony, not only whether [an accused] suffer[s] from an abnormal mental condition, but also whether the nature and extent of any condition from which it [finds] him to be suffering [is] such as to relieve him of criminal responsibility under the standards then prevailing." [28]

We have also been told by the Court of Appeals that this task is the jury's alone, and not the judge's [29] or the psychiatrist's [30]—although the latter have been held free, in all but one appellate decision since Durham,[31] to testify that any given condition amounts to a mental disease.[32] We are also told that the trier, in determining whether to accept the medical conclusion of "mental illness"

28. Stewart v. United States, 1954, 94 U.S. App.D.C. 293, 295, 214 F.2d 879, 882.

29. Taylor v. United States, 1955, 95 U.S. App.D.C. 373, 379, 222 F.2d 398.

30. Briscoe v. United States, 1957, 101 U.S.App.D.C. 318, 321, 322, note 6, 248 F.2d 640, 643, 644, note 6 (the footnote stated that the then-current decision of St. Elizabeths' psychiatric staff to classify sociopathy as not a mental disease within the Durham rule "encroaches upon the jury function.")

31. Moore v. United States, 1960, 107 U.S. App.D.C. 332, 277 F.2d 684 (en banc 5–4). The Court there held that an individual whose only claim of mental aberration was an intelligence test score of 69, which placed him in the "moron" category, "is not a person suffering from either a 'disease' or a 'defect' as this court has defined those terms." 107 U.S.App.D.C. at page 334, 277 F.2d at page 686.

32. Among those cases are several in which trial courts were reversed for holding, apparently as a matter of law, that the condition here asserted to be a mental disease, sociopathy, did not amount to legal insanity: Stewart v. United States,

supra note 28; Taylor v. United States, supra note 29; and Briscoe v. United States, supra note 30. See also Dukes v. United States, supra note 19; Blocker v. United States, 1959, 107 U.S.App. D.C. 63, 64, 274 F.2d 572; and Lyles v. United States, 1957, 103 U.S.App.D.C. 22, 32–33, 254 F.2d 725, 735–736 (dissenting opinion).

This rule which we follow allowing sociopaths to be considered criminally irresponsible in proper cases is contrary to the position taken by the British Royal Commission, which said in its Report:

"For the present we must accept the view that there is no qualitative distinction, but only a quantitative one between the normal average individual and the [sociopath], and the law must therefore continue to regard the [sociopath] as criminally responsible" (p. 139) ; and by the New York State Governor's Committee on the Defense of Insanity, which said:

"In the present state of knowledge we are satisfied that there is no escape from treating persons of this order [sociopaths] as subject to conviction and a problem for the organs of correction." 140 New York L.J. 4 (November 5, 6, 1958).

and to find that it is sufficient to relieve an accused of criminal responsibility, may consider its "nature and extent" [33] and may "apply 'our inherited ideas of moral responsibility.' " [34] It has been made clear, however, that the trier is not at liberty to disregard expert testimony completely, for in several cases the Court of Appeals has reversed findings of guilty where psychiatric testimony was unanimous in concluding that the crime in question was the product of the diseased mind of the defendant.[35]

Thus, it is clear from these decisions that the medical conclusion "mental disease" is not completely binding on the trier of fact; but the corollaries to this rule are not so easily formulated. Principally uncertain is whether the trier's task is to discover as a *medical question* the soundness or unsoundness of the conclusion, or whether the task is to judge it against some *legal standard*—a particularly pressing problem where the experts put forth contrary conclusions.[36]

In the Briscoe case the Court seemed to take the latter view when it said,

> "If, by testimony that the accused either was or was not suffering from a 'mental disease' or a 'mental defect,' a psychiatrist would be expressing a judgment that the accused should or should not be acquitted, that would be a legal rather than medical judgment and would usurp the function of the trier of the facts." [37]

Yet, in the later Carter case the Court—with the writer of the Briscoe and Durham opinions, Judge Bazelon, a member of the panel—said that the notion that "there was a 'legal insanity' different from any clinical mental illness * * * was not true in a juridical sense," and that the mental disease which is the touchstone of legal irresponsibility is "a medically recognized illness of the mind." [38]

This issue is presently one of the questions before the full panel of the Court of Appeals in the second Blocker appeal.[39] Rather than delay a re-trial of the defendant in the present case, and because findings of fact and conclusions of law may be amended if this case is again tried without a jury and if there is a decision in Blocker after a re-trial here, the Court will now indicate its rationalization of the apparently conflicting positions of the Court of Appeals, and the questions which it believes may be asked in the light of its interpretation.

The Court believes that whether a given defendant's condition amounts to a "mental disease" is a question of fact which is determined by a trier after asking some questions which are particularly medical in orientation, and other questions which may not be necessary to a strictly medical diagnosis. Thus, in the re-trial of this case, the Court hopes that the previously expressed medical conclusion that the defendant is mentally diseased may be probed by such medically-oriented questions as: [40]

> there is no way of knowing whether they [the examining psychiatrists] used the terms 'sound mind' or 'mental disease' or 'mental defect' in their legal or medical sense." Id., 101 U.S.App.D.C. at page 321, 248 F.2d at page 643.

33. Stewart v. United States, supra note 28.

34. Durham v. United States, supra note 1, 94 U.S.App.D.C. at page 242, 214 F.2d at page 876.

35. See the cases cited, supra, at note 25.

36. See generally, DeGrazia, "The Distinction of Being Mad," 22 U.Chi.L.Rev. 339, 343–44 (1955), and 68 Harv.L.Rev. 364, 365 (1954).

37. Briscoe v. United States, supra note 30, 101 U.S.App.D.C. at page 322, 248 F.2d at page 644. Earlier in the same paragraph the opinion stated, " * * *

38. Carter v. United States, supra note 13, 102 U.S.App.D.C. at page 236, 252 F. 2d at page 617.

39. Blocker v. United States, No. 15,777, Brief for Appellant Point 3.

40. The Court would also like the psychiatrists to comment on a matter going to "productivity," namely, whether there is any psychiatric significance to the fact

1) Is defendant's mental condition a "progressive" mental disorder? If it is not, do psychiatrists recognize any difference of a significant nature between mental disorders which are progressive and those which are not? If so, what differences are recognized?

2) Does treatableness have any bearing on whether a condition is classified as a mental disease? If so, is it true that there are some types of psychoses—and it is apparently conceded that sociopathy is not a psychosis—which are recognized by all to be mental diseases but which are not treatable? [41]

The Court also hopes that the psychiatric witnesses will indicate "whether or not the accused understood the nature of what he was doing" and whether he had the capacity to control his impulses to commit any acts which he realized were violative of the law [42]—even if the answers to these questions were not necessary to their medical findings of mental illness.

Finally, the Court hopes that the psychiatric witnesses will again attempt to indicate, as they tried to do at the first trial, how this individual—claimed to be mentally ill—differs from individuals considered to be free from mental disease. Specifically, if a testifying psychiatrist considers criminals generally to be free from mental disease, the Court will be interested in knowing how this individual's mental make-up differs from that of these "ordinary criminals." [43]

■■ The testimony being concluded, it will be the task of the trier of fact to evaluate it—lay and expert alike—to discover whether it is sufficient to produce a reasonable doubt that there was a mental illness and that the crime in question was its product. In considering the experts' opinions, the trier's task is as it is in any other case where an essentially medical question is involved: if the trier believes they are logically arrived at, they are accepted; if not, they are rejected.[44] It is precisely be-

that each successive check which Amburgey is charged with forging was for a larger amount.

41. This question is an acute one for the Court, because on the first trial the St. Elizabeths' psychiatrists testified that one classified as sociopathic personality, anti-social type is not, to their knowledge, considered treatable. One psychiatrist testified that no patient at St. Elizabeths thus classified had been helped in the past three years; the other doctor thought one individual, perhaps, had been helped. But see Lyles v. United States, supra note 32, 103 U.S.App.D.C. at page 32, 254 F.2d at page 735 note 2 (dissenting opinion of Judge Bazelon, citing authorities who maintain that sociopathy is psychiatrically treatable).

The Court recognizes that should psychiatrists testify that mental conditions are classified as "diseases" regardless of their treatability, it will be required to face the question of whether the defendant is mentally diseased without any consideration of the relative benefits which either imprisonment or commission to mental institution could give him.

If, as a consequence, defendant is found not guilty by reason of insanity, this would result in his being committed to a mental institution where treatment seems not to be available, when he might be better off under the kind of rehabilitative measures available in a penal institution. If so, it might be time to re-examine our system under which a finding of guilty-jail or probation, and not guilty by reason of insanity-mental hospitalization. D.C.Code § 24–301(d).

42. The Court indicated the propriety of these questions in Douglas v. United States, supra note 24, 99 U.S.App.D.C. at page 238, 239 F.2d at page 58.

43. The Court thus rejects the contention that it is not the duty of those charged with eliciting the facts at the trial level "to try to pin the psychiatrists down" to specifics, where that is at all possible. See Zilboorg, "A Step Toward Enlightened Justice," 22 U.Chi.L.Rev. 331, 334–35 (1955).

44. See 7 Wigmore § 1920 (3d Ed. 1940).

cause the conclusions of the experts must be weighed in this fashion that it is necessary to probe their bases. Finally, if the trier believes there is a reasonable doubt that the condition described amounts to a mental disease and that the crime has been its product, a verdict of not guilty by reason of insanity should be entered, even if the trier would not himself classify the particular condition as a mental illness.

An order effecting the above has been filed herewith.[45]

45. The United States Attorney having indicated to the Court that the Government had no additional evidence to be offered at a second trial, the Court, in accordance with its ruling at footnotes 24, 25 of this opinion, entered judgment of not guilty by reason of insanity, and signed an order confining defendant to St. Elizabeth's Hospital. D.C.Code § 24–301(d).