### DICKERSON v. UNITED STATES.
### No. 5861.

Court of Appeals of the District of Columbia.
Argued March 6, 1933.
Decided May 29, 1933.

Cedric F. Johnson, of Washington, D. C., for appellant.

Leo A. Rover, U. S. Atty., and William H. Collins and John J. Sirica, Asst. U. S. Attys., all of Washington, D. C.

Before MARTIN, Chief Justice, and ROBB, HITZ, and GRONER, Associate Justices.

ROBB, Associate Justice.

Appellant, Dickerson (known as Wimbley, which appellation we shall adopt herein), and John M. Crowder, were jointly indicted for the murder by drowning of appellant's wife, Elizabeth Wimbley, on September 17, 1931, and were convicted of murder in the second degree. *Crowder did not appeal.*

Wimbley and the deceased were married in September 1930. Mrs. Wimbley was a widow and had an infant child, the offspring of her former marriage. Wimbley lived with his wife for short periods, and for some time prior to her death he had lived with another woman, Ida May Graves, whom he bigamously married on April 3, 1931.

During the month of July, 1931, Wimbley interviewed two or three insurance brokers with reference to obtaining accident insurance on the life of his wife. He executed two applications for such insurance, on both of which he forged his wife's signature. On one of these applications a $10,000 accident policy was issued; Wimbley being the beneficiary named in the policy. He inquired of the agent as to the accidents covered by the policy, and was told that it covered "all ordinary accidents." Wimbley then inquired whether the policy would cover death as the result of taking poison by mistake, and was informed that it would. After asking a number of other questions, he inquired: "Even if the person insured under your policy should happen to go on the river in a rowboat, and they can't swim, and the boat turns over and they are drowned, would it cover it, too?" The agent replied that it would cover the drowning, provided it was proved that it was an accident.

On September 15, 1931, Wimbley and Crowder rented an automobile and drove to Dendron, Va., where Wimbley's wife and his little stepdaughter were staying with relatives. The next morning Wimbley, Crowder, Mrs. Wimbley, and the child returned to Washington. Arrangements were made that night with Crowder for an alleged fishing trip the following day. On the morning of the next day—that is, on September 17, 1931—the entire party took a taxi to the boathouse at the Chesapeake & Ohio Canal near Chain Bridge in this district. Wimbley insisted on renting a canoe, although there were rowboats available, and he mendaciously suggested to the attendant that he had rented canoes there before. A short time later the canoe was overturned, and his wife and the baby were drowned, notwithstanding that his wife could swim and that Wimbley was an expert swimmer who had "saved quite a few people." Crowder also was a good swimmer. Wimbley and Crowder made conflicting statements as to how the tragedy occurred. In some of these statements Mrs. Wimbley and the child were said to have been alone in the canoe when it capsized; while from other statements Crowder was attempting to get into the canoe and accidentally capsized it while Wimbley stood within a few feet; and other statements placed Wimbley more than a hundred feet away.

Wimbley and Crowder were arrested the night of the drowning, and two days later (September 19th) Crowder made a detailed statement to the police officers, which was reduced to writing, and on September 22d was signed by him. This statement was introduced in evidence. In it Crowder stated that on the trip to Dendron, Va., the speedometer was manipulated so that it would not register the entire mileage; that "after passing through Fredericksburg he (Wimbley) then told me what his plans were and what he intended to do. * * * He told me that in case of death by fire or accident he would get double the amount from what the policy read. Then he told me his intentions of what he was going to do. He was going down there to burn the whole family, the wife and house, three little children, one boy about fourteen and the next to him nine, and next a little girl about eight." After leaving Richmond, they stopped at a gasoline filling station and Wimbley purchased a five-gallon can of gasoline. After getting the gasoline, they proceeded toward Dendron, turning off the macadamized road to a dirt road. A large piece of cloth was over the front seat of the car to protect the seat from the greasy clothes of the mechanics. Wimbley tore this in two; took sand from the road, and made two sand-

bags; "after putting the sandbags in the car he said he would use them for to knock the people out and throw gas on them and burn them." According to the statement, during the night Wimbley went to Crowder's room in the house at Dendron to ascertain whether he would go through with the murder. Crowder answered in the negative, and the project was then abandoned.

As to what occurred just prior to the drowning, Crowder in his statement said: "Mr. Wimbley suggested that I take his wife and baby out to fish, to ride around in the canal, saying that he would remain on the bank. I paddled around on the canal about half an hour or more, resting frequently. The canoe drifted down the canal. Finally Mr. Wimbley takes his coat and his pole and walks on down the canal. After he got down there, I was watching him walk along the shore. He made a funny motion like this [indicating with his arm that he wanted Crowder to turn the canoe over]. Seeing this motion, I paddled ashore to where he was standing. He asked why we came ashore. I told him I was tired. We all got out on the shore and I got a fishing pole and dropped the line into the canal. He was possibly three or four or five feet away from here; he says, 'Why didn't you turn the damn canoe over?' I shook my head no. She (Mrs. Wimbley) asked me if I wanted to take her out again. I told her all right. He was looking pitchforks and knives and everything else at me; that's the impression he gave me. Her and her baby was put back in the canoe by Wimbley. He said he would stay on shore and fish. When I went to get in the boat, I had one foot over the boat, and slipped and the canoe turned over. * * * I imagine he (Wimbley) was about two or three feet away from me."

Crowder did not take the stand; Wimbley did.

The first three assignments of error relate to the action of the trial court in admitting evidence concerning the procurement of the $10,000 accident policy. It is contended that, inasmuch as prior to the trial the policy itself had been suppressed as evidence, it was error to permit the government through other evidence to prove the fact of the insurance. The record discloses that after the drowning representatives of the insurance company, without solicitation from the police, furnished them with information concerning the insurance. It is at once apparent that the evidence was material as indicating intent and motive for the crime. McUin v. United States, 17

App. D. C. 323, 329. Assuming, therefore, that the policy itself, having been found in Wimbley's room, was properly suppressed as evidence, that constituted no reason for the suppression of the testimony of the insurance agents.

The next assignment of error challenges the admission in evidence, as against Wimbley, of Crowder's statement. The government, out of the presence of the jury, offered testimony that the statement was voluntary, and the court so ruled. The ruling was fully justified by the evidence. Brady v. United States, 1 App. D. C. 246, 249.

In Sparf & Hansen v. United States, 156 U. S. 51, 15 S. Ct. 273, 275, 39 L. Ed. 343, it was ruled that, if one of two persons accused of having committed the crime of murder makes a voluntary confession in the presence of the other, under such circumstances that the other naturally would have contradicted it if he did not assent, the confession is admissible in evidence against both. In that case the mate of the bark Hesper was murdered on the high seas. Five seamen, St. Clair, Sparf, Hansen, Green, and Larsen were put in irons by order of the captain and so kept during the voyage of more than a thousand miles from the locality of the murder to Tahiti, an island in the South Pacific. They then were taken ashore, and subsequently, while still in irons, were sent to San Francisco for trial. At the trial Green and Larsen, witnesses for the government, were permitted to state what Hansen had said to them in Sparf's presence during the voyage from Tahiti to San Francisco. The court said: "The declarations of Hansen after the killing, as detailed by Green and Larsen, were also admissible in evidence against Sparf, because they appear to have been made in his presence, and under such circumstances as would warrant the inference that he would naturally have contradicted them if he did not assent to their truth." See, also, Raffel v. United States, 271 U. S. 494, 497, 498, 46 S. Ct. 566, 70 L. Ed. 1054.

In the present case much less time had elapsed between the murder and the statement. The evidence discloses that, after the statement had been reduced to writing, it was read to Crowder at police headquarters in Wimbley's presence, and then to Wimbley, and that Crowder stated that it was true. Wimbley said nothing. Wimbley testified that he had no recollection of the reading of the statement, "but that he insisted upon Mr. Sirica (assistant United States attorney) reading the statement at the morgue because

he did not know what was in it." It does not appear that he then made any denial of its truth. In our view, Crowder's statement was admissible in evidence as against Wimbley, since it was made "under such circumstances as would warrant the inference" that Wimbley would have contradicted it if he did not assent to it. On this point the court charged the jury, in part, as follows: "Was that statement as it was read to him (at headquarters) in the circumstances in which he was then placed, such a statement as would naturally call from him a denial or an explanation or comment? If so, and he fails to make such a denial or an explanation, then you may give to that refusal such interpretation and construction as you think under all the circumstances, in reason and common sense, should be given to it. And if that leads you to believe that a failure to deny or explain should be treated as an assent to what was therein stated, then you may so consider it. If you have any doubt about it, then I think you should give him the benefit of that doubt and disregard it as any admission or confession on his part of the facts therein stated against him."

The government introduced in evidence a letter written by Wimbley to his wife a short time prior to the drowning and, following her death, found among her effects at the home of the parents of her deceased first husband and turned over by them to the insurance company's representative, who was accompanied by members of the homicide squad. The letter disclosed a hostile attitude and contradicted Wimbley's later protestations of love and affection. The letter, having come into the hands of the prosecution through a third party, thereby lost its privileged character. State v. Mathers, 64 Vt. 101, 23 A. 590, 15 L. R. A. 268, 33 Am. St. Rep. 921; State v. Buffington, 20 Kan. 599, 27 Am. Rep. 193. See, also, Halback v. Hill, 49 App. D. C. 127, 261 F. 1007; Bassett v. United States, 137 U. S. 496, 11 S. Ct. 165, 34 L. Ed. 762.

The evidence does not disclose that Crowder had any previous acquaintance with Mrs. Wimbley. His only motive for assisting in her murder was disclosed in his statement, as follows: "He (Wimbley) said, if I would help him, I will fix you up, but didn't say what with."

We have read the record, which is needlessly long, with great care, and, being satisfied that the verdict was fully justified and that the record discloses no prejudicial error, we affirm the judgment.

Affirmed.