Stephen S. **KELLEY**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 12857.

United States Court of Appeals District of Columbia Circuit.

Argued March 23, 1956.

Decided July 26, 1956.

19. Knell v. Feltman, supra note 3 [85 U.S. App.D.C. 22, 174 F.2d 666].

20. Supra note 10.

21. See, e. g., 68 Harv.L.Rev. 697 (1955).

Before EDGERTON, Chief Judge, and WILBUR K. MILLER and FAHY, Circuit Judges.

FAHY, Circuit Judge.

In Kelley v. United States, 95 U.S.App. D.C. 267, 221 F.2d 822, we reversed appellant's earlier conviction of robbery and remanded the case for a new trial, with opportunity for pre-trial proceedings with respect to the competency of the accused to stand trial. Pursuant to 18 U.S.C. § 4244 (1952) such proceedings were had, resulting in a judicial determination that appellant was competent to stand trial. He was retried, was again convicted and again appeals.[1]

We dispose first of appellant's contention that the prosecution failed to establish beyond a reasonable doubt that he was sane when the indicted offense occurred. Two doctors testified. One said that on the basis of two examinations about three months after the robbery Kelley was of unsound mind when examined, suffering from dementia praecox, and that the condition had existed "a considerable period of time." He did not, however, connect the disease in any explicit manner with the crime. The other doctor examined appellant once, in July, 1952, but in testifying did not remember him except from the record of his findings. On refreshing his recollection, apparently from the record referred to, he believed appellant had been of unsound mind "for some time." He too omitted any explicit reference to the mental disease as a cause of the crime.[2]

Other witnesses also gave material evidence on the sanity issue. These included employees of the telephone company who witnessed the robbery,[3] officers

Mr. Bennett Boskey, Washington, D. C., (appointed by this Court) for appellant.

Mr. Carl W. Belcher, Asst. U. S. Atty., with whom Messrs. Leo A. Rover, U. S. Atty., at the time record was filed, Lewis Carroll and Alfred Hantman, Asst. U. S. Attys., were on the brief, for appellee.

1. The crime for which he was indicted is defined in § 22-2901, D.C.Code 1951, and was charged to have been committed April 25, 1952.

2. The examinations by the doctors above referred to were at the request of the District Court in connection with a judicial inquiry which resulted in a determination by that Court that appellant was incompetent to stand trial in 1952. As a result Kelley was sent to St. Elizabeths Hospital, where he remained about four months, from October 7, 1952, to February 13, 1953, when the Superintendent certified that he "has recovered his reason and that he is now of sound mind." It was because another judicial determination of his competency was not made before he was tried that we reversed his earlier conviction. Kelley v. United States, supra.

3. Their verdict showed that the jury believed one of the participants to be appellant.

who arrested appellant and interviewed him at some length, and a motor company credit manager who sold appellant a Cadillac car about five days after the robbery. He testified about appellant selecting the car, filling out a credit application, and finally consummating the sale in the name of a brother, making a deposit of $1,350 in small bills.[4] This witness testified he talked to appellant off and on practically the whole day; that appellant was well-dressed, well-mannered and well-spoken, and impressed him as well-educated; that he was responsive; that the application was completed with information supplied by appellant and contained quite a number of statements as to his personal history and background; that appellant discussed various subjects, running the gamut from sports to literature and there was nothing unusual about his demeanor, appearance or remarks.

On the whole evidence it was for the jury to decide the issue of sanity. They were well instructed within the principles laid down by this court in Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430, and on this record we should not disturb their resolution of the issue. See Holloway v. United States, 80 U.S.App.D.C. 3, 148 F.2d 665; Bell v. United States, 93 U.S.App.D.C. 173, 210 F.2d 711.

■■■ We are obliged however, to reverse and grant a new trial because of the erroneous admission of prejudicial evidence as now explained.[5] Lewis J. Wilkins had been indicted and originally tried with appellant for the same rob-

bery. He was found not guilty by reason of insanity. In the case now under review appellant accordingly was tried alone. The evidence against him was circumstantial. A taxicab driver identified him as a fare he had driven with Wilkins to the vicinity of the robbery at approximately the time it occurred and driven away again after they had been gone a short time. But neither of the two telephone company employees who witnessed the robbery and who testified could positively identify appellant as a participant. About two days after the arrests Wilkins and appellant were interrogated in the presence of each other and of Officers Reed and O'Neill concerning a statement of the taxicab driver who identified Wilkins and appellant. Officer Reed testified that Wilkins admitted the truth of what the taxicab driver had said about the trip to and from the vicinity of the crime, but that when he asked Kelley if he had anything to say about this Kelley responded, "I do not wish to comment on it until I see my lawyer."[6] The relation by the officer of what the taxicab driver and Wilkins had said was by itself inadmissible because hearsay evidence, for it was evidence of statements made by persons other than the witness, introduced in order to establish the truth of the statements. However, admissions or confessions are admissible against the party who made them despite the rule against hearsay evidence,[7] and the Government contends that the statements of the taxicab driver and Wilkins, when coupled with appellant's reaction to them, constitute an admission or confession by appellant, since the jury could infer from

---

4. The robbery had netted the two robbers $1,014.00. There was evidence to the effect the loot was about equally divided between them.

5. Testimony like that which we now consider was also introduced at the first trial but we did not, unfortunately as it now appears, rule upon its admissibility when we reversed on other grounds, thinking it was unnecessary to do so. Since the case is here again with a similar question we realize it would have been better had we ruled upon it on the first appeal.

6. Or, according to Officer O'Neill's version, "Mr. Kelley said that he didn't care to make any statements until he consulted his lawyer."

7. Whether because testimony of admissions and confessions is not obnoxious to the rule or because it is admitted under an exception to the rule is unimportant. See Morgan, "Admissions As An Exception To The Hearsay Rule," 30 Yale L.J. 355; IV Wigmore, Evidence §§ 1048–50 (3d ed. 1940).

his refusal to deny the accusations that he admitted their truth.

The general principle applicable to this type of evidence is that an accusatory statement and the defendant's failure to deny it are admissible only if the circumstances are such "as would warrant the inference that he would naturally have contradicted [it] if he did not assent to [its] truth." Sparf v. United States, 156 U.S. 51, 56, 15 S.Ct. 273, 275, 39 L.Ed. 343. See cases cited in Annotations, 80 A.L.R. 1235, 115 A.L.R. 1510. There is uncertainty among the decisions, both within and without this jurisdiction, as to whether the fact of arrest is alone sufficient to negate any such inference predicated upon the silence of the accused. Compare Dickerson v. United States, 62 App.D.C. 191, 65 F.2d 824, certiorari denied 290 U.S. 665, 54 S.Ct. 89, 78 L.Ed. 575; Hardwick v. State, 26 Ala.App. 536, 164 So. 107; Raymond v. State, 154 Ala. 1, 45 So. 895; and People v. Amaya, 134 Cal. 531, 66 P. 794, with Skiskowski v. United States, 81 U.S.App. D.C. 274, 279, 158 F.2d 177, 182, certiorari denied sub nom. Quinn v. United States, 330 U.S. 822, 67 S.Ct. 769, 91 L.Ed. 1273; United States v. Lo Biondo, 2 Cir., 135 F.2d 130; McCarthy v. United States, 6 Cir., 25 F.2d 298; and People v. Rutigliano, 261 N.Y. 103, 184 N.E. 689. Courts which exclude the evidence point out that when a person is under arrest many motives other than a reluctance to tell the truth may cause him to remain silent in the face of an accusation. O'Hearn v. State, 79 Neb. 513, 522, 113 N.W. 130, 134, 25 L.R.A.,N.S., 542, states this rationale as follows:

" * * * Perhaps the weight of authority in this country is with those courts which hold that the mere fact of arrest is sufficient to render a statement made in the presence of the prisoner to which he makes no reply incompetent evidence, for the reason that no assent can be presumed under such circumstances, and that the very surroundings of the accused in such case are such as to render it entirely proper and natural for him to keep silent in the fear of misquotation or misconstruction. A person in such a situation would naturally fear that the worst possible interpretation would be placed upon his language, that the memories of those present would lean to statements prejudicial to his interests, and that an officer seeking to convict might supply through zeal any defect in the statement which was actually made."

And in State v. Hester, 137 S.C. 145, 185, 134 S.E. 885, 898–899, the court said:

" * * * [I]t cannot be disputed, that many people, and even persons who are entirely innocent of wrongdoing, are afraid to talk in the presence of detectives. We must not forget, too, that from time immemorial it has generally been conceded an unwise thing for those charged with criminal offenses to talk to anybody and everybody about their cases, and especially to engage in conversation with those who may not be friendly to them. For years and years the members of the bar have cautioned their clients not to discuss their cases with those with whom they came in contact, unless absolutely assured of their friendship, and many good lawyers have advised clients to refrain from talking at all. This has been the practice so long that it has become a well-known fact to our people generally."

But we need not select the rule we would apply had the accused simply remained silent, for he spoke, and gave as his reason for refusing to make a statement his desire first to consult his lawyer. In this situation the factors mentioned in the above quotations are reinforced by an explicit rebuttal of any inference that the accused was admitting the truth of the accusations, and the rule stated by Chief Judge Laws in United States v. Kelly,[8] D.C., 119 F.Supp. 217, 221–222, applies:

---

8. Not to be confused with the appellant Kelley.

"But whatever may be the correct rule with regard to silence on the part of a defendant upon reading a statement attributing crime to him, the facts of this case present a different problem. Defendant Kelly was not silent. His statements 'I'll tell my story to my lawyer' and 'I have nothing to say at this time' appear to be the assertion of his legal right to refuse to talk. During an examination by the police while under arrest a defendant, usually conscious and often cautioned that anything he says may be used against him, well may be restrained from participating in a discussion of the case with police officers by a belief his interests will better be served at the time by exercising his right to remain silent. It is not reasonable to interpret an assertion of right as constituting an admission of guilt. Kelly's refusal to comment on Washington's confession may therefore not be construed as an admission of guilt, and is not admissible in evidence against him."

The erroneous admission of this testimony would by itself constitute sufficient ground for reversal. But what was perhaps even more damaging evidence was also erroneously admitted. Appellant had been picked up as a suspect after he purchased the Cadillac, and was brought with Wilkins to police headquarters. During an interrogation there Wilkins made detailed statements implicating appellant. This occurred in appellant's presence and in the presence also of Officers O'Neill and Reed and of a Mr. Hamilton, one of the telephone company employees above referred to. At the trial Hamilton and the officers, over defense objections, related to the jury the accusatory statements of Wilkins. Hamilton said appellant made no statement in response; but the testimony of the officers, who asserted that appellant said he did not want to make any statement until

he consulted his lawyer, shows that Hamilton did not mean that appellant had remained entirely silent. If we stop here it is apparent the testimony of what Wilkins and appellant said out of court was inadmissible under the authorities we have hereinabove set forth. The Government contends, however, that appellant rendered admissible the testimony of the officers as to what Wilkins said in appellant's presence, because of the whole of what transpired. Officer Reed testified that after appellant responded, "I do not wish to make a statement until I see my lawyer," the Officer said to him, "Well, this is a very serious accusation, and I think you should have something to say about it." Appellant then said, "Do you think I would tell you something that would put me in jail?"[9]

This remark did not render Wilkins' accusation admissible through the testimony of the officers. Such evidence of a detailed accusatory statement of an alleged accomplice is hearsay, unless adopted by the defendant, and obviously is very damaging. As this court has pointed out before, "The cases repeatedly emphasize the need for careful control of this otherwise hearsay testimony * * *." Skiskowski v. United States, supra, 81 U.S.App.D.C. at pages 278–279, 158 F.2d at pages 181–182. See, e. g., State v. Hester, supra, 137 S.C. at pages 186–189, 134 S.E. at pages 899–900; State v. Jackson, 150 N.C. 831, 832–833, 64 S.E. 376, 377. Appellant's remark was not such an adoption of or reaction to Wilkins' accusation as to furnish a reason for receiving that accusation, made out of court, as evidence. And since appellant's remark was admitted for no other purpose both it and the accusation were erroneously placed before the jury. To decide otherwise would be to permit appellant to be convicted on hearsay evidence about what a person found by a jury to be insane—Wilkins— had said. Such a decision is, we think, out of the question.[10]

9. Or, as Officer O'Neill recalled appellant's words, "Why should I tell you anything that would send me to jail?"

10. Since the evidence referred to is held to have been erroneously admitted for the reasons stated, we do not pass upon the

Since a new trial may be had we call attention to the admonition contained in Taylor v. United States, 95 U.S.App.D.C. 373, 379, 222 F.2d 398, 404.[11] In event the issue of sanity as a defense is again before the District Court the following statement in Taylor will become pertinent:

" * * * [W]e think that when an accused person has pleaded insanity, counsel may and the judge should inform the jury that if he is acquitted by reason of insanity he will be presumed to be insane and may be confined in a 'hospital for the insane' as long as 'the public safety and * * * (his) welfare' require. Though this fact has no theoretical bearing on the jury's verdict it may have a practical bearing."[12]

Reversed and remanded.

**WILBUR K. MILLER, Circuit Judge (dissenting).**

The crime was committed by the appellant, Stephen S. Kelley, and one Lewis J. Wilkins April 25, 1952. They were arrested early in the morning of May 12 and were taken to the Robbery Squad office. There, in the presence of Kelley, two police sergeants and two other witnesses, Wilkins accused Kelley of planning and, with his assistance, executing the robbery. Kelley's reaction was thus described by Sgt. Reed:

"I asked the defendant Kelley what did he have to say about Wilkins' statement. At first he said, 'I do not wish to make a statement until I see my lawyer.' So I said, 'Well, this is a very serious accusation, and I think you should have something to say about it.' And he looked at me and said, 'Do you think I would tell you something that would put me in jail?' "

Sgt. O'Neill testified to the same effect, except that he quoted Kelley as saying, "Why should I tell you anything that would send me to jail?"

Reversal of the conviction rests on the court's holding that testimony as to Wilkins' accusation was inadmissible because Kelley did not simply remain silent but spoke, and said he did not want to make any statement until he had consulted his lawyer. This, my brothers say, amounted to "an explicit rebuttal of any inference that the accused was admitting the truth of the accusation * * *." Perhaps so, had Kelley adhered to his plan to say nothing. But he went on to say, "Do you think I would tell you something that would put me in jail?" The case turns on the significance of this remark, and the meaning which is fairly and reasonably attributable to it.

The majority say the remark "was not such an adoption of or reaction to Wilkins' accusation as to furnish a reason for receiving that accusation, made out

question whether it would be inadmissible because of the rule barring involuntary confessions or because of the Fifth Amendment imperative that no person "shall be compelled in any criminal case to be a witness against himself * * *." U.S.Const. Amend. V. The applicability of either theory to this case is strongly suggested by Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568. The Bram decision has had a mixed reception by the federal courts. Compare United States v. Lonardo, 2 Cir., 67 F.2d 883, 885, and Murphy v. United States, 7 Cir., 285 F. 801, 812–813, with Purpura v. United States, 4 Cir., 262 F. 473, 476. It has been strongly attacked by Wigmore, see III Wigmore, Evidence §§ 821 n. 2, 823 n. 5, 832 n. 1, and some doubt

has been cast upon its continued vitality by the Supreme Court itself. See Stein v. People of State of New York, 346 U.S. 156, 190–191 note 35, 197–198, 73 S.Ct. 1077, 97 L.Ed. 1522 (dissenting opinion of Mr. Justice Black). Nevertheless, the decision has never been expressly overruled, and its application of the Fifth Amendment to this type situation finds strong analogical support in Helton v. United States, 5 Cir., 221 F.2d 338, and Ellis v. State, 8 Okl.Cr. 522, 128 P. 1095, 43 L.R.A.,N.S., 811.

11. The issue of sanity will again be open though our reversal is on an unrelated ground.

12. Footnotes have been omitted.

752

of court, as evidence." The trial judge thought it was enough to make the accusation competent, and I agree. Instead of denying the charge and instead of remaining silent until he had consulted an attorney, as he had resolved to do, Kelley gave the officer an "evasive and defiant" answer.[1] In evading direct comment on the accusation, he said in effect that a truthful statement would put him in jail. He talked too much for his own good, as so many so often do. Kelley's first conviction was properly reversed, I thought; but I cannot agree that this second one should be set aside.

---

1. Snowden v. United States, 1893, 2 App. D.C. 89, 93.