Isaiah **BRADLEY**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 13431.

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 19, 1957.

Decided Sept. 20, 1957.

Dissenting Opinion Nov. 12, 1957.

Petition for Rehearing In Banc Denied
Dec. 20, 1957.

Mr. Albert J. Ahern, Jr., Washington,. D. C., with whom Mr. James J. Laughlin, Washington, D. C., was on the brief, for appellant.

Mr. Donald E. Bilger, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., Lewis Carroll, and Arthur J. Mc-Laughlin, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, DANAHER and BURGER, Circuit Judges.

DANAHER, Circuit Judge.

Appellant was indicted for robbery, alleged to have occurred on or about December 3, 1954. Upon arraignment on April 1, 1955, a plea of not guilty was entered. On July 1, 1955, it was determined judicially that appellant was not competent to stand trial, whereupon he was committed to St. Elizabeth's Hospital. On May 3, 1956, it was certified that he was then competent to stand trial. Trial commenced on June 5, 1956, and the jury, rejecting a defense based upon insanity at the time of the robbery, returned a verdict of guilty. His appeal charges that the trial judge erred

in refusing to direct a verdict of not guilty by reason of insanity, and, despite the absence of a request, in failing to instruct the jury on the legal meaning of "causal connection" between the state of mind of the appellant and the robbery itself.

■ A psychiatrist testified that he examined the appellant on May 27, 1955, June 13, 1955, and June 27, 1955. He then concluded that appellant was suffering from dementia praecox paranoid type, and that this condition had existed for a period of two to three years which would have included the date of December 3, 1954. He based his opinion upon a history of delusions and hallucinations, as narrated to him by the appellant. On cross examination the witness explained that "his mind was not completely out. A psychotic's mind, a psychotic person can still do certain things." Asked specifically whether or not the crime of robbery, as charged, was a product of the mental disease he answered, "Now that I am not able to give you any certain degree of any answer with any certainty. I am not sure whether it was * * * I am not sure whether the crime which he committed was a product of his mental disease." The witness had made no check until the day of trial to ascertain with what crime the appellant had been charged. The same doctor explained that "An unlawful act which is committed by a psychotic person is not necessarily a product of his mental condition."

The trial judge asked: "As I understand the question * * * you have been unable to state that the robbery with which this man is charged is a product of such condition as you found him to have?"

The witness: "Not with any degree of certainty, your Honor. I could only say that I am inclined to agree that the unlawful act which he committed was the result of his mental condition." He added that such was his opinion because the psychosis was far advanced.

Further questioning developed the answer: "You see, there are certain things that a psychotic person can do. He still knows where he is. He is still able to travel. He is still able to go to a restaurant and eat his meals. A psychotic person can do a great many things although they are psychotic * * * he could not tell me what he had done. He was unable to tell me what he did."

The witness had no information concerning symptoms except as the appellant told him about them. He made no check through any other sources, and "my conclusions were based only upon what I found during my examination."

The doctor testified that even if he had checked with the man's family and found that he had a work record from 1950 until the time of the examination, his opinion would not be affected for "many psychotic persons have a very good work record."

Testimony was offered by the appellant's wife and by his brother-in-law concerning abnormal conduct of the appellant, but it was brought out through appellant's wife that from the time of the marriage in 1950, appellant had been steadily employed as a roofer and an electrical worker. Two police officers testified that they observed no abnormality in the speech or the conduct of the appellant.

A woman clerk at Aristo Cleaners detailed events at the time of the robbery. She testified that just prior to her closing the store at 7:30 P.M. on December 3, 1954, the appellant entered. She continued:

"He walked over to the counter to the corner of the cash register and he had his right hand in his topcoat pocket and in the other hand he had a paper bag. He stuck it around the corner of the register. He said 'Put it in there,' and I hesitated for a minute or so * * *.

* * * * * *

"and he said 'go ahead and put it in there' and I started to put the money in the bag, right down to the pennies. He said 'Never mind the pennies but give me what you got underneath.' That was what

I had started to take out and laid under the counter when he opened the door and came in.

\* \* \* \* \* \*

"After I put the money in the bag he said 'Now go back in the back and stay there five minutes and don't touch that telephone.' He started back over and opened the door, and he pulled a handkerchief out of his pocket and wiped the door knob and down the side, both sides of the door, and went out. We had a large plate glass window on the side. He went down along the side of the window and he was still watching me, and I had never moved from in front of that register."

The jury might readily conclude, upon all of the evidence, that the accused was not insane at the time of the crime. "The conflict was submitted to the jury under instructions which in this regard are not questioned, and which included one that the burden was on the Government to prove beyond a reasonable doubt that the appellant was of sound mind at the time of the killing."[1]

■ The charge contemplated by the Durham case[2] does not change the functions of the judge and jury in criminal cases where "insanity" is relied upon as a defense. The Durham rule does not alter the law governing the direction of verdicts by the court. To remove a case from the jury's consideration, the judge must be able to say that reasonable men must necessarily possess a reasonable doubt as to the defendant's sanity,[3] i.e., that they could not reasonably reach any conclusion except that the prosecution has failed to sustain its burden of proving beyond reasonable doubt that

the accused "was capable in law of committing crime."[4] If, upon all the evidence, such is the posture of the case, the accused is entitled to an acquittal of the specific crime charged.[5] Conversely, the case must go to the jury if the prosecution has shown (1) that no mental disease or defect exists, or (2) that the act was not the product of an existing mental disease or defect.[6]

Considering the testimony of the lay witnesses and the qualified if not equivocal nature of the psychiatric testimony, and allowing proper play to the right of the jury to draw justifiable inferences therefrom, we believe the jury could properly have concluded beyond a reasonable doubt that the act was *not* the product of an existing mental derangement. We need go no farther. The fact that a jury might have found the existence of such a doubt does not justify the court's directing an acquittal by reason of insanity. The issue here was properly left for the jury's determination, and we cannot say its conclusion was not a permissible choice in light of all the evidence.

■ As to the remaining ground upon which this appeal was based, the trial judge instructed in pertinent part:

"The law does not hold a person criminally responsible if he is mentally deranged and his derangement causes him to commit a crime. But it is not every kind of mental derangement or mental deficiency which is sufficient to relieve a person of responsibility for his acts. \* \* \* In order for a person to be held not guilty of a crime by reason of insanity, there are two requirements:

1. Bell v. United States, 1953, 93 U.S.App. D.C. 173, 174, 210 F.2d 711, 712; and see Kelley v. United States, 1956, 99 U.S. App.D.C. 13, 15, 236 F.2d 746, 748.

2. Durham v. United States, 1954, 94 U.S. App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430.

3. See Curley v. United States, 1947, 81 U.S.App.D.C. 389, 160 F.2d 229, cer-

tiorari denied, 1947, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850.

4. Davis v. United States, 1895, 160 U.S. 469, 484, 16 S.Ct. 353, 357, 40 L.Ed. 499.

5. Ibid.

6. Cf. Douglas v. United States, 1956, 99 U.S.App.D.C. 232, 239, 239 F.2d 52, 59; Kelley v. United States, supra, note 1.

"1) He must have suffered a mental defect or mental disease at the time of the offense, in this case, as of December 3, 1954, and

"2) His act must have been the product of that mental defect or disease.

\* \* \* \* \* \*

"As to the second requirement, that the criminal act was the product of the mental abnormality, this simply means that the act committed must have resulted from or been produced or caused by the mental disease or mental defect suffered by the defendant. Thus, your task would not be completed upon a finding, if you so find, that the accused suffered a mental disease or defect at the time of the robbery. He would still be criminally responsible for his unlawful act, unless you should find further that there was a causal connection between his mental abnormality and the act with which he is charged. But if you should find both, that the defendant at the time of the robbery was suffering from some mental abnormality and that this abnormality caused his act, then you would find the defendant not guilty by reason of insanity."

Apart from a lack of conviction that the trial judge erred, we find it unnecessary so to decide. Not only had there been no special requests to charge in a particular way, no exception was taken to the charge as given. Indeed, when counsel was asked if there was anything to add he replied "I am satisfied, your Honor."[7]

■ One of our colleagues asked that supplemental memoranda be submitted by respective counsel as to a matter not raised on appeal. The trial judge asked the psychiatrist his opinion as to the appellant's mental condition on the day of the trial. The answer was "I believe he is of sound mind."

There has been some suggestion that it was improper under 18 U.S.C. § 4244 for the trial judge to ask such a question and to bring out the reply. We of the majority have considered this point and have concluded that there was no error. The doctor had relied solely upon his conversations with the appellant in May and June 1955, for a conclusion that the appellant had been of unsound mind on December 3, 1954. Accepting the appellant's description of his delusions, the witness had said that the appellant had been of unsound mind for some two or three years. Yet, by June 1956, without further examination, he was willing to venture the opinion that the appellant then was of sound mind. It was within the discretion of the trial judge, especially in the light of the testimony as a whole, that he undertake either to clear up the conflict or, if possible, to resolve inconsistencies.

■ Our colleague further asked that counsel submit in their memoranda discussion of another point not raised on appeal, touching upon possible error in the charge. The trial judge said in part: "If your verdict is not guilty by reason of insanity, the Court will make an order for the defendant's confinement in a mental hospital, where he will remain until it is judicially determined he is of sound mind, at which time he will be released." The point is made that the judge did not add that the statute[8] requires more than a judicial determina-

---

**7.** As the issue was here raised, and in the absence of some special circumstances as to which greater particularization might, upon proper request, have been required, the excerpt from the charge seems clear and unequivocal. In at least three important respects, differently stated, the jury was told, as the Durham rule requires, that the criminal act must be the product of the mental disease if a finding of not guilty by reason of insanity is to be reached. Cf. Durham v. United States, supra note 2, 94 U.S.App.D.C. at page 241, 214 F.2d at page 875. Different treatment here might have caused confusion. Cf. Flowers v. State, Ind.1956, 139 N.E.2d 185, 194. We adhere to our statement in the Durham case, supra.

**8.** D.C.Code, §§ 24–301 to 24–303 (Supp. V 1957).

tion of "sound mind"; and therefore that the judge should have told the jury that release requires a finding that "such person has [not only] recovered his sanity [but] that such person will not in the reasonable future be dangerous to himself or others * * *."

Undoubtedly the trial judge recognized that the statutory criteria must be satisfied before it may be "judicially determined" that such a person as appellant is eligible for release. It is arguable that the instruction as given failed to spell out all details. Since no request was made for enlargement of the instruction, we are not required to consider the alleged error.[9] While plain error or defects affecting substantial rights may be noticed although not brought to the attention of the court,[10] we do not feel that the circumstances of the present case compel the exercise of our discretion to that end.

His complete guilt otherwise having been established, we are satisfied that there was no error.

Affirmed.

BAZELON, Circuit Judge (dissenting).

When this case was argued, two other cases—Wright v. United States, 102 U.S.App.D.C. ——, 250 F.2d 4; and Lyles v. United States, —— U.S.App.D.C. ——, —— F.2d ——, —had already been argued to the full court and were awaiting decision. Since all of the issues presented by the present case were involved in one or the other of those cases, it was my view that the division of the court which heard this case should have awaited the full court's determination of those issues. My brothers did not share my view. I therefore reserved the right to file my dissent after the full court's action. The full court has now determined the issues [1] and, it seems to me, in a manner contrary to my brothers' conclusions in this case.

I think that under those determinations (1) appellant is entitled to a directed verdict of acquittal by reason of insanity; and (2) even if the case were properly one for submission to the jury, the instructions to the jury were defective in two respects: (a) they failed to convey with clarity that sanity was an element of the crime required to be proven by the Government beyond a reasonable doubt; and (b) they inaccurately informed the jury of the statutory consequences of a verdict of acquittal by reason of insanity.

I.

When the accused has introduced some evidence of his insanity and "the Government has not sustained its burden of proof, i.e., when it appears that reasonable jurymen could not conclude beyond a reasonable doubt that the act was not the product of defendant's mental illness, 'there is a duty * * * to direct a verdict of not guilty by reason of insanity.'" Wright v. United States, supra note 1; Douglas v. United States, 1956, 99 U.S.App.D.C. 232, 237, 239 F.2d 52, 57; see also Carter v. United States, —— U.S.App.D.C. ——, —— F.2d ——.

As the majority states, appellant introduced the testimony of his wife and brother-in-law concerning abnormal conduct on his part. The wife, who was the person who turned appellant in to the police when she learned of the robbery, testified that he threw knives at the wall, that he cried, that he bought sleeping pills for the purpose of killing her and himself and that he repeatedly claimed he could hear her having sexual relations with a non-existent man named "Jimmy." She testified further that, on one occasion, after demanding that the police be called to arrest him, he summoned them himself and, when they arrived, asked to be jailed. He said: "I ain't done nothing. I just want to get away. I want to go to jail." The police refused to arrest him, suggesting instead that

---

9. Fed.R.Crim.Proc. rule 30, 18 U.S.C.

10. Id. 52(b).

1. Wright v. United States, 102 U.S.App.D.C. ——, 250 F.2d 4; Lyles v. United States, —— U.S.App.D.C. ——, —— F.2d ——.

he go to a hospital for observation. The brother-in-law's testimony confirmed this last incident.

Then the defense called Dr. de Filippis, of District of Columbia General Hospital, one of the two doctors who had examined appellant in May and June of 1955, by order of the District Court, for the purpose of reporting whether he was competent to stand trial. Dr. de Filippis testified that he had diagnosed appellant to be suffering from an advanced condition of dementia praecox, paranoid type, and that the condition had existed for two to three years, a period which included the date of the robbery. He described the delusions and hallucinations which he found appellant to be suffering. The doctor stated further that he was competent to detect malingerers and that, in his opinion, appellant was not malingering. As to whether the robbery was the product of appellant's mental illness, the doctor said that, in his opinion, it was, although he could not say so "with any degree of certainty." He explained, "On account of the severity of his symptoms, it is my opinion that when he committed the act, he had lost all sense of reality and judgment, which did not allow him to consider the consequences of his act."

That the showing of insanity thus made by the accused was sufficient to place upon the Government the burden of proving beyond a reasonable doubt that the robbery was not the product of mental illness[2] is beyond question. What remains in question is whether the Government has borne its burden.

The Government's entire case consisted of the testimony of the victim describing the robbery and the testimony of two policemen. The description of the robbery could support an inference that appellant had a capacity to plan a crime and methodically execute it. The testimony of the policemen was that they were able to understand appellant, that he seemed to have no trouble understanding them, and that they observed nothing to indicate that he was suffering from any mental illness. One policeman had been with appellant only ten to fifteen minutes; the other about two hours. Neither policeman claimed to have any training, experience or aptitude in detection of mental illnesses.

It is upon the foregoing evidence that the majority states the jury "might readily conclude * * * that the accused was not insane at the time of the crime." I cannot agree that any reasonable man could reach that conclusion beyond a reasonable doubt.

In the first place, the showing of insanity by which appellant invoked the Government's burden of proving sanity was a very strong one. The principal witness, Dr. de Filippis, is an expert whose qualifications were not impugned by the Government. He is a member of the staff of a Government hospital and he examined the appellant by court order. It neither is nor can be suggested that he had any bias in favor of the defense. The only challenge to his testimony at the trial was that he based his diagnosis upon what the accused told him without attempting to corroborate the information. But, as the doctor explained in his testimony, he was not concerned with the abstract truth of incidents related to him by the subject. The only fact the truth of which was material was the existence of the subject's delusions. The truth of that fact the witness was concededly qualified to measure and did measure. Moreover, the principal delusion which the doctor found appellant to have, that he could hear his wife, through the walls of his cell, engaging in sexual relations with another man, was corroborated by the testimony of the wife. She had stated that his repeated charges of such non-

---

2. Davis v. United States, 1895, 160 U.S. 469, 488, 16 S.Ct. 353, 40 L.Ed. 499; Wright v. United States, supra note 1; Douglas v. United States, 1956, 99 U.S. App.D.C. 232, 239 F.2d 52; Durham v.

United States, 1954, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430; Tatum v. United States, 1951, 88 U.S.App.D.C. 386, 190 F.2d 612.

existent acts were what caused her to inform against him to the police. No suggestion is made that a wife who turns her husband in to the police in order to get rid of him is biased in his favor.

The majority devalues the doctor's testimony on the additional ground that it lacked certainty in respect of the element of causation. But, as we pointed out in Wright v. United States, supra,[3] citing our decision in Blunt v. United States, 1957, 100 U.S.App.D.C. 266, 244 F.2d 355, 364-365, "the opinion to which a psychiatrist testifies, need only be 'the type of clinical opinion he is accustomed to form and to rely upon in the practice of his profession.' It need not consist of 'mathematically demonstrable certainties.' "

There was thus nothing in the evidence presented by appellant which could support a conclusion beyond a reasonable doubt that he had been sane at the time of the robbery.[4] What was added by the Government's evidence? Two things are pointed to: the victim's description of the crime as showing appellant's capacity to plan and the policemen's opinions that appellant was not suffering from any mental illness.

Capacity to plan does not prove that the planner is not suffering from an advanced condition of dementia praecox. A criminal act "may be coolly and carefully prepared; yet * * * still the act of a madman." Royal Commission on Capital Punishment 1949–1953. Report (Cmd. 8923) 110 (1953). That a sufferer from dementia praecox can plan and commit a crime without realization of wrong is a concept with which

we are familiar.[5] In the absence of psychiatric evidence that capacity to plan is inconsistent with the claimed illness, the jury can reach that conclusion only by speculation. Here there was no evidence from which the jury could infer that capacity to plan showed mental health. Such psychiatric evidence as there was indicated the contrary. It was Dr. de Filippis' opinion that appellant's illness was not of the type to prevent him from knowing where he was or what he was doing, but it "did not allow him to consider the consequences of his act."

As regards the last of the Government's evidence, the testimony of the two policemen, I think what the court said in Carter[6] and quoted with approval in Wright[7] is dispositive:

"* * * Of course the testimony of a lay witness with training in this or related fields may have more value than the testimony of a witness with no such training. Also obvious upon a moment's reflection is the fact that, while a lay witness's observation of abnormal acts by an accused may be of great value as evidence, a statement that the witness never observed an abnormal act on the part of the accused is of value if, but only if, the witness had prolonged and intimate contact with the accused."

As we said in Wright, "in the face of a substantial showing of insanity," the Government does not sustain its burden of proving sanity "simply by having two policemen testify, 'He looked all right to me.' "[8]

To say that the Government does not sustain its burden merely by introduc-

---

3. 102 U.S.App.D.C. at page ——, 250 F.2d at page 8.

4. The majority refers to the wife's testimony that appellant had been steadily employed as a roofer and an electrical worker. An inference from such a fact that appellant was not mentally ill would disregard the medical fact, testified to by Dr. de Filippis, that the ability to hold a job and even "have a very good work

record" is not inconsistent with a psychotic condition.

5. See Blunt v. United States, 1957, 100 U.S.App.D.C. 266, 244 F.2d 355, 362 note 21.

6. —— U.S.App.D.C. at page ——, —— F.2d at page ——.

7. 102 U.S.App.D.C. at page ——, 250 F.2d at page 10.

8. Ibid.

ing such evidence as it introduced here is not to say that the burden is one that cannot be borne. From the District Court record we know that appellant was a mental patient at Gallinger Municipal Hospital for a month in 1948 and at St. Elizabeths Hospital for about eight months just before his trial. It also appears that he was examined by another doctor at about the same time that Dr. de Filippis examined him. Neither side introduced any of the evidence which was obviously available from all of those sources. We cannot tell whether such evidence would have tended to sustain the Government's burden of proving appellant's sanity. It may be that it would have fortified his showing of insanity. Whatever it would have shown, it can hardly be doubted that the interests of justice would be better served by airing such evidence than by ignoring its existence.

## II.

Even if the majority were right in concluding that there was evidence from which the jury could have found beyond a reasonable doubt that the robbery was not the product of a mental disease or defect, the judgment of conviction should nevertheless be reversed, because the trial judge failed to give the jury proper instructions.

The accused's sanity, properly placed in issue, is an element of the offense which, like every other element, must be proved by the Government beyond a reasonable doubt.[9] Since there is no question that appellant's sanity was placed in issue, it follows that the jury should have been instructed to acquit by reason of insanity unless the Government had proved beyond a reasonable doubt the necessary element that the robbery was not the product of a mental disease or defect.

It is not enough, in my view, that there was language in the instructions from which the jury might have drawn the correct rule. The charge as a whole must be so constructed as to convey that rule to the jury clearly, unequivocally and beyond likelihood of easy confusion. The present charge, by this test, was erroneous. The charge, read as a whole, did not instruct the jury that it should acquit by reason of insanity if it was not convinced beyond a reasonable doubt that the robbery was not the product of mental illness. The jury could have understood the charge to say that the burden and standard of proof of sanity are different from those applying to other elements of the alleged offense.

Dealing with the other elements of the offense, the judge instructed the jury:

"In order for you to find this defendant guilty of robbery, *you must find that the Government has proved beyond a reasonable doubt the following essential elements:*[10]

"1) That this defendant took something of value from the complainant;

"2) That he took it unlawfully and with the intent to convert it to his own purpose;

"3) That he took it from the complainant's person or immediate actual possession; and

"4) That he took it by force or violence, against resistance, or by sudden or stealthy seizure or snatching, or by putting the complainant in fear.

\* \* \* \* \* \*

"*If you find that the Government has proved each of the essential enumerated elements in the manner which I have specified, then you may find this defendant guilty. If, however, you find the Government has failed to sustain in the manner which I have recited to you, namely, by evidence beyond a reasonable doubt, any element or several elements, then you must find the defendant not guilty.*"

On the element of sanity, he charged:

"In considering the issue of the defendant's sanity at the time of the

---

9. Supra note 2.

■■■■■■■■

10. Emphasis supplied throughout.

offense, it is not necessary for you to determine the type of mental disease or defect, *if any you should find,* from which the defendant was suffering. *All that is necessary as to this element is for you to determine that the defendant was suffering from a mental disease or mental defect.* \* \* \* your task would not be completed *upon a finding, if you so find, that the accused suffered a mental disease or defect at the time of the robbery.* He would still be criminally responsible for his unlawful act, *unless you should find further that there was a causal connection between his mental abnormality and the act with which he is charged.* But *if you should find both,* that the defendant at the time of the robbery was suffering from some mental abnormality and that this abnormality caused his act, *then you would find the defendant not guilty by reason of insanity."*

The obvious difference in treatment between the element of sanity and the other elements of the crime created a danger that the jury might believe here, as in Wright[11] and Carter, [12] that, to acquit by reason of insanity, it would be necessary for them to reach the affirmative conclusion that appellant was mentally ill at the time of the crime and that the act was the product of the illness. And just as in Carter,[13] the judge's continued emphasis of this theme could easily have impressed it on the minds of the jurors beyond repair by a subsequent statement in the charge that the Government must prove sanity beyond a reasonable doubt.

The second error in the instructions to the jury involves the so-called Taylor v. United States[14] rule, recently discussed in Lyles v. United States,[15] Catlin

v. United States,[16] and Tatum v. United States.[17] Unlike Tatum where the trial court refused to give the Taylor instruction, in this case the judge undertook to give it. But the terms in which he gave it, in my opinion, defeated its purpose.

We said in Lyles:

"We think that when the instruction is given the jury should simply be informed that a verdict of not guilty by reason of insanity means that the accused will be confined in a hospital for the mentally ill until the superintendent has certified, and the court is satisfied, that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or to others, in which event and at which time the court shall order his release either unconditionally or under such conditions as the court may see fit." —— U.S.App.D.C. at page ——, —— F.2d at page ——.

In the instant case, the court instructed the jury that, if Bradley were acquitted by reason of insanity, "the Court will make an order for the defendant's confinement in a mental hospital, where he will remain until it is judicially determined that he is of sound mind, at which time he will be released." He did not instruct the jury that release would depend not merely upon a finding of recovery of sanity, but also upon a finding that Bradley would not be dangerous to himself or others. The judge compounded his error by first eliciting from Dr. de Filippis testimony that Bradley was "of sound mind" at the time of the trial. Thus, the judge did not give the jury the understanding of a verdict of not guilty by reason of insanity which Lyles holds it should be given. What he told the jury amounted to this: "The defendant is now of sound mind;

11. 102 U.S.App.D.C. at page ——, 250 F.2d at page 12.

12. —— U.S.App.D.C. at page ——, —— F.2d at page ——.

13. Ibid.

14. 1955, 95 U.S.App.D.C. 373, 379, 222 F. 2d 398, 404.

15. Supra note 1.

16. —— U.S.App.D.C. ——, —— F.2d ——.

17. 101 U.S.App.D.C. 373, 249 F.2d 129.

and if you acquit him by reason of insanity and he is determined to be of sound mind, he will be released." The effect of the instruction was to invite the jury to decide the insanity issue, not on the evidence, but rather on the basis of an erroneous conception of the consequences of acquittal.[18]

The omission of the "danger" part of the instruction is error not only under what we said in Lyles. It is error because it disregards the language of the Act of August 9, 1955, D.C.Code § 24–301 (Supp. V, 1951), adopted after our Taylor decision. It also disregards our formulation of the instruction in Taylor: that the individual would remain committed "as long as 'the public safety and * * * [his] welfare' require."[19] Finally, it disregards the rule of law established at least since Barry v. White, 1933, 62 App.D.C. 69, 71, 64 F.2d 707, 709, and recognized in Durham v. United States, 1954, 94 U.S.App.D.C. 228, 242, 214 F.2d 862, 876, note 57, that a person committed after acquittal by reason of insanity can obtain his release only upon a determination that releasing him would be "without menace to the public peace or safety."

Lyles makes the proper instruction mandatory hereafter, unless it affirmatively appears that the defendant does not want it. In the instant case, which was tried after our Taylor opinion but before our Lyles opinion, it does not appear that appellant did not want the proper instruction. But we need not decide whether, in these circumstances, the instruction was mandatory in the sense that failure to give it would be plain error. It is enough to say here that to undertake to give an instruction which is designed to promote justice and to give it in such distorted form as to subvert rather than promote justice is plain error affecting substantial rights.

---

18. See my dissenting opinions in Lyles v. United States, —— U.S.App.D.C. at page ——, —— F.2d at page ——; and Tatum v. United States, 101 U.S.App.D.C. at page 377, 249 F.2d at page 133. See also Durham v. United States, 1956, 99 U.S. App.D.C. 132, 237 F.2d 760.

