**UNITED STATES of America,
Appellee,**

v.

**Carl A. PICCIOLI, Appellant.**

**No. 489, Docket 29521.**

United States Court of Appeals
Second Circuit.

Argued June 8, 1965.

Decided Oct. 29, 1965.

both counts before Chief Judge Timbers and a jury. He was sentenced on the first count to imprisonment for one year and a fine of $5,000; on the second, imposition of sentence was suspended and probation fixed at two years.

Piccioli was one of the proprietors of the Pin-Up Bar in Bridgeport. Special Agent Ripa of the I.R.S. testified (on cross-examination) that "Artie" Gjanci, a defendant in United States v. Costello, 352 F.2d 848 (2 Cir. 1965), instructed that, through arrangement between himself and Piccioli, Ripa could place bets with Piccioli and that, when doing this by phone, he should say "This is Bill for Artie." Thereafter Ripa placed numerous horse race bets with Piccioli. There was evidence of furtiveness on Piccioli's part in accepting Ripa's wagers and paying his winnings. During the October 8 raid described in the Costello opinion, Special Agent Macolini obtained nearly $500 in cash and checks from Piccioli's pockets, along with three issues of a horse racing publication used by bookmakers. On that occasion in one hour a Connecticut State Trooper, engaged in the search of the Pin-Up Bar, received 23 calls from persons who were seeking to ascertain odds or, as the jury could properly infer, were about to place bets. Since this and other evidence warranted conviction, we turn to Piccioli's claims of error:

(1) Our Costello opinion details the publicity on October 8 and 9. When Piccioli was put to plea in New Haven on October 21, he requested that trial be had in Bridgeport, where the publicity had been most intense. On November 30 and December 1, four juries to try Piccioli's and other gambling cases were selected from the same venire, apparently with the understanding that the cases would be tried *seriatim;* the record shows no objection to that procedure and, when Piccioli's jury was being selected, the only venireman who recalled reading or hearing of his case was not chosen. His trial was adjourned until after that of Costello, Marchetti and Gjanci, which was widely publicized in the Bridgeport press.

Philip Baroff, Bridgeport, Conn. (Charles Hanken, Bridgeport, Conn., on brief), for appellant.

Howard T. Owens, Jr., Asst. U. S. Atty. (Jon O. Newman, U. S. Atty., District of Connecticut), for appellee.

Before WATERMAN, FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge:

Piccioli was charged in a two-count indictment with violating 26 U.S.C. § 7302 by wilful failure to pay the special gambling tax, 26 U.S.C. § 4411, and to register, 26 U.S.C. § 4412, and was convicted on

Piccioli's name figured in this, he being the "Carl" referred to in our opinion in that case; the papers reported he had been subpoenaed by the Government and had been excused at his lawyer's request. When Piccioli's case was called for trial on December 15, his counsel sought a new jury or a continuance because of the publicity given the Costello trial and Piccioli's involvement in it. The judge denied this but said he would inquire of the jurors, which he did without objection from counsel. When asked whether they had read or heard anything about the case or about Piccioli, there was no response.

■■ In this aspect Piccioli's case is not significantly different from that of Costello, Marchetti and Gjanci. No objection on the score of the publicity on October 8 and 9 was made before the adverse verdict. The only issue relating to publicity which was brought to the judge's attention prior to trial was the newspaper accounts of the trial of Costello, Marchetti and Gjanci. A correct report of the trial and conviction of other persons for the same type of offense would not in and of itself be prejudicial, even when, as here, one of them figured in the evidence at the later trial; and there is no reason to suppose the jurors would read into the request that Piccioli be excused a claim of the privilege against self-incrimination. Moreover, we see no reason why the judge had to disbelieve the jurors' responses that the reports had not come to their attention.

(2) Another point has more merit but, in our view, not enough to demand reversal. Special Agent Macolini testified that after completing his search at the Pin-Up Bar, he told Piccioli and the latter's attorney, Mr. Hanken, who had entered the kitchen area in pursuit of a cup of coffee shortly after the raid, that he would like to ask "a few personal history questions"; that the attorney said he had instructed Piccioli not to answer questions; that Macolini then submitted his question sheet to Mr. Hanken; and

that the attorney allowed Piccioli "to answer those personal history questions that were on the sheet." No objection was made to this, and the subject was not revived by counsel in cross, redirect, or recross examination. At the conclusion of Macolini's testimony, the judge reverted to this episode and, over objection by defense counsel, elicited an affirmative answer from Macolini to a question, "But the defendant was instructed in your presence by Mr. Hanken not to answer any questions with respect to whether or not he was accepting horse wagers on the premises." After listening to argument, the judge said, "I simply wanted to get it clear in my mind, and I assume the jury did also, as to precisely what happened," and then instructed "that, once the defendant was placed under arrest, it was his privilege under the Constitution not to answer any questions that might tend to incriminate him under Federal law * * * What brought the question on my part was, I was not quite sure what was meant by personal history questions, as distinguished from whatever questions he declined to answer." In submitting the case to the jury, the judge recounted Macolini's testimony and added that Mr. Hanken had a right to advise Piccioli not to answer questions and that Piccioli had a constitutional right not to do so.

■ Inquiry designed to establish that a defendant claimed the privilege against self-incrimination before a grand jury or a legislative committee or failed to testify at a former trial has been held in several cases to constitute reversible error. See Grunewald v. United States, 353 U.S. 391, 415–424, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); Stewart v. United States, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed. 2d 84 (1961); United States v. Gross, 276 F.2d 816 (2 Cir. 1960). If the privilege attaches at the moment of arrest, as the judge assumed, inquiry to show its assertion at that time would seem equally banned.[1] And we would reach the same conclusion although that assumption is

1. Presumably this is what is meant by the statement in Fagundes v. United States,

340 F.2d 673, 677 (1 Cir. 1965), characterizing the right to remain silent on ar-

wrong and the right of an arrested person not to respond rests simply on the lack of any power in the police to compel testimony—a hotly controverted issue [2] which we need not here decide. Silence under such circumstances, at least when, as in this case, it results from the advice of an attorney, affords no fair ground for relevant inference, see Kelley v. United States, 99 U.S.App.D.C. 13, 236 F.2d 746, 749 (1956); yet a jury would be likely to give it not inconsiderable weight. As said by Mr. Justice Harlan in Grunewald, supra, 353 U.S. at 424, 77 S.Ct. at 984, with respect to a claim of privilege before a grand jury, "the dangers of impermissible use of this evidence far outweighed whatever advantage the Government might have derived from it if properly used." Cf. McCarthy v. United States, 25 F.2d 298 (6 Cir. 1928); United States v. Pearson, 344 F.2d 430 (6 Cir. 1965).

The judge's question, for which the cold record affords no apparent reason, was thus ill-advised, to say the least. Nor was it cured, as the Government urges, by his subsequent instruction that the lawyer and Piccioli had been acting within their rights; the proper caution would have been that the evidence was to be disregarded and no inference drawn therefrom. But we cannot see that the question and answer added anything so significant to what Macolini had testified on his direct examination without objection as to afford sufficient basis for reversal, 28 U.S.C. § 2111, F.R.Cr.P. 52(a).

(3) The final point requiring discussion is the contention that the judge took impermissible considerations into account in passing sentence.

Piccioli was sentenced on January 11, 1965, along with defendants in other gambling tax cases. In explaining the sentences in the Costello, Marchetti and Gjanci cases, Chief Judge Timbers made certain remarks which we set forth in part in the margin.[3] He followed these by recommending that the United States Attorney forward a transcript of them and of the evidence to Connecticut pros-

rest as "akin to the right to decline to take the witness stand in one's own defense." See also Helton v. United States, 221 F.2d 338, 340–342 (5 Cir. 1955); but see Kelley v. United States, 99 U.S. App.D.C. 13, 236 F.2d 746, 750–751 n. 10 (1956).

2. See 8 Wigmore, Evidence § 2252, at 328–29 & n. 27 (McNaughton rev. 1960); Morgan, The Privilege Against Self-Incrimination, 34 Minn.L.Rev. 1, 27–30 (1949); Note, The Privilege Against Self-Incrimination: Does It Exist in the Police Station?, 5 Stan.L.Rev. 457 (1953); 1 Morgan, Basic Problems of Evidence 146–48 (1961); Maguire, Evidence of Guilt § 2.03, at 15–16 (1959).

3. "The Court regards these charges as serious. It is faced with the duty of imposing sentence following a finding of guilty by a jury.

"While it is true that these are tax cases, prosecutions authorized by the revenue laws of the United States, it is also a fact, with respect to which the Court is not blind, that it is the clear intent of Congress, in authorizing such prosecutions, to deal with a vice, namely that of gambling.

"While it is perfectly true, and no one knows better than the Court, that the charge against these defendants was not that of gambling, it is equally true that the prosecutions never would have been brought and there never would have been convictions but for extensive gambling and accepting of wagers as demonstrated by the evidence.

"As this Court has observed before, one of the handmaidens of vice in any community—here graphically demonstrated in the Bridgeport community—one of the handmaidens of vice is that of gambling. The other two, with which this Court has dealt severely and will continue to deal severely, are those of narcotics and prostitution. Of course it is well known that the revenue from gambling is the financial basis or keystone upon which much of crime is built.

"The Court does not intend, in imposing sentence here, to deal out the slap on the wrist which has characterized sentences imposed by the State Courts for violations of the State gambling laws. The Court intends, by the sentences here to be imposed, to serve a stern warning, once again, as the Court has repeatedly in the past, that the United States is not powerless to deal effectively with violations of the Federal revenue laws and particularly the law here involved. It will do so, if need be, alone."

ecutors. Later, on February 8, before taking up the criminal calendar in New Haven, Chief Judge Timbers made a further statement about the gambling tax cases with which he had been concerned. In this statement, some nine printed pages long, he praised the work of the United States Attorney and his staff, of the Intelligence Division of the Internal Revenue Service, and of the Connecticut State Police; deprecated the absence of cooperation by the local Bridgeport police and "the apparent lack of willingness or ability on the part of certain of the prosecutors (in one instance under the pretense of 'public apathy,' which is pure, unadulterated bunk) and judges of the state circuit court to back up the local and state police in enforcing the gambling laws of this state"; and noted "the ground swell of public support throughout the state for what has been accomplished by this latest federal crackdown upon gambling and organized crime." After announcing his intention to impose stiff sentences for violation of the federal gambling tax and related laws, he ended by proposing that a Connecticut Conference on Law Enforcement be convened, and outlined a detailed program for its membership and activities.

 The circumstances under which an appellate court will interfere with a sentence within the permissible maximum because of the judge's reliance on allegedly irrelevant criteria, see United States v. Wiley, 267 F.2d 453 (7 Cir. 1959), are and, so long as such sentences are generally unreviewable, ought to be rare. It would be wholly appropriate for the judge to look beyond Piccioli's failure to register and buy a $50 tax stamp and to consider the attendant substantial losses of revenue through his failure to pay the percentage tax on wagers, of which the judge had heard abundant evidence, even though that crime had not been charged. Cf. United States v. Doyle, 348 F.2d 715 (2 Cir. 1965). Piccioli's argument is thus reduced to the claim that the judge was enforcing not simply the federal laws which were his proper concern but state laws which were not.

The record does suggest that the judge's indignation at what he had learned at the trials and from presentence reports may have led to statements in the prosecutorial area beyond his function. On the other hand, since he could have taken into account a record of state crimes and charges unrelated to the federal offense proved, it would be strange if he could not consider that the evidence showed a violation of state gambling laws and the effect of gambling on other state crime. Cf. United States v. Doyle, supra.

Piccioli's other points either are dealt with in United States v. Costello or lack sufficient merit for discussion.

Affirmed.